Steven H. Newman, Esq.
Katsky Korins LLP
605 Third Avenue
New York, New York 10158-0038
Telephone: (212) 953-6000
E-Mail: snewman@katskykorins.com
*Attorneys for 211 Thompson Owners Corp.*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

In re

        Chabad of Gramercy Park,

            Debtor.

---------------------------------------------------------------------x

Chapter 11

Case No. 25-40105-jmm

**OBJECTION OF 211 THOMPSON OWNERS CORP. TO TRUSTEE'S AND EMG TRANSFER AGENT LLC'S JOINT MOTION FOR ENTRY OF (A) AN ORDER (I) SCHEDULING A HEARING ON THE APPROVAL OF THE SALE OF THE DEBTOR'S PROPERTIES, (II) APPROVING CERTAIN BIDDING PROCEDURES AND STALKING HORSE BIDDER PROTECTIONS, AND THE FORM AND MANNER OF NOTICE THEREOF, AND (III) GRANTING RELATED RELIEF; AND (B) AN ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT, (II) AUTHORIZING THE SALE OF THE DEBTOR'S PROPERTIES FREE AND CLEAR OF ALL ENCUMBRANCES, AND (III) GRANTING RELATED RELIEF**

TO: THE HONORABLE JIL MAZER-MARINO,
    CHIEF UNITED STATES BANKRUPTCY JUDGE:

211 Thompson Owners Corp. (the "**211 TOC**"), by and through its undersigned counsel,

Katsky Korins LLP, hereby files this objection (the "**Objection**") to the Trustee's and EMG Transfer

Agent LLC's Joint Motion for Entry of (A) an Order (I) Scheduling a Hearing on the Approval of

the Sale of the Debtor's Properties, (II) Approving Certain Bidding Procedures and Stalking Horse

Bidder Protections, and the Form and Manner of Notice Thereof, and (III) Granting Related Relief;

and (B) an Order (I) Approving the Asset Purchase Agreement, (II) Authorizing the Sale of the

Debtor's Properties Free and Clear of All Encumbrances, and (III) Granting Related Relief [DE 225] (the "**Sale Motion**"), and respectfully states as follows:

## **PRELIMINARY STATEMENT**

1. This Objection is filed on behalf of 211 TOC, an innocent creditor that was victimized by the Debtor's serial misconduct and which now faces the prospect of recovering nothing from this estate. 211 TOC holds an administrative expense claim of $135,192.88 and an unsecured claim of $975,661.76 -- claims arising directly from the Debtor's post-petition and pre-petition breaches of its lease obligations. The Sale Motion, filed by the Trustee and EMG Transfer Agent LLC (the "**Secured Lender**") on March 30, 2026, seeks approval of bidding procedures and authorization to sell substantially all of the Debtor's real property assets -- outside of a confirmed plan -- pursuant to a "naked auction" (i.e. without a stalking horse bidder), on a materially compressed timeline (bids due only 14 days after the hearing), and under conditions that virtually guarantee no third-party bidder will participate. The unmistakable purpose and effect of this Sale Motion is to transfer the Properties to the Secured Lender through a credit bid, leaving 211 TOC and every other creditor -- administrative, priority, and unsecured alike -- with nothing. For each of the reasons set forth herein, 211 TOC respectfully submits that the Court should deny the Sale Motion because:

(a) The proposed bidding procedures are fundamentally unfair and designed to chill competitive bidding: (i) the marketing period is grossly inadequate -- only two weeks for potential bidders to evaluate, finance, and bid on five (5) Manhattan commercial properties; (ii) the Secured Lender exercises veto power over every material decision, including whether competing bids even "qualify"; and (iii) the Secured Lender's unrestricted right to credit bid its approximately $24 million claim ensures that no rational third-party bidder would invest the time and expense required to investigate the Properties and meaningfully participate in the sale, knowing the Secured

Lender can outbid any cash offer at no cost. *See, e.g.*, *In re Diocese of Buffalo*, 637 B.R. 701, 704-05 (Bankr. W.D.N.Y. 2022) (denying sale motion and observing "Why would anyone incur the cost of participating?");

(b)    The Sale Motion seeks approval of "stalking horse bidder protections" when no stalking horse bidder *exists* -- a transparent attempt to secure pre-approval of break-up fees and other protections in the abstract, without any price floor or competitive tension to benefit the estate;

(c)    The proposed sale constitutes an impermissible *sub rosa* plan that would dispose of substantially all estate assets—five Manhattan commercial properties representing the entirety of the estate's value—and dictate the outcome for all creditors, thereby "short circuit[ing] the requirements of Chapter 11 for confirmation of a reorganization plan," *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007), and depriving creditors of the disclosure of "adequate information", voting, "best interests" test, payment of administrative expenses, and absolute priority protections that Congress mandated;

(d)    A Section 363 sale will unnecessarily forfeit substantial estate value: sales under a confirmed plan qualify for transfer tax exemptions under 11 U.S.C. § 1146(a), while Section 363 sales do not -- and for properties valued at approximately $24 million, the combined New York State and City transfer taxes (exceeding 2.5% of consideration) will cost the estate *hundreds of thousands* of *dollars* that would otherwise be available for creditors;

(e)    The movants own pleadings reveal that the Trustee will imminently file a plan of liquidation with an effective date of approximately May 31, 2026 -- yet the Sale Motion provides *no explanation whatsoever* for why the sale cannot proceed through that plan, which would afford creditors statutory protections and preserve the transfer tax exemption. **The movants' silence is telling: there is no legitimate business justification for bypassing the plan process**, and

3

"appeasement of major creditors" is not a permissible reason under *Lionel*, 722 F.2d at 1070; and

(f)    The Sale Motion is designed to benefit *only* the Secured Lender -- at the expense of 211 TOC and every other creditor. If the Court permits this sale to proceed without meaningful carve-outs for administrative expenses and unsecured creditors, the estate will expend substantial resources (such as professional fees, Trustee fees, broker commissions) on a sale that generates *zero* cash for anyone other than the Secured Lender. Under such circumstances, the bankruptcy process serves merely as a vehicle for the Secured Lender to obtain "cleansed" title to the Properties. If the Secured Lender refuses to fund a meaningful carve-out, the Court should instead lift the automatic stay and permit the Secured Lender to pursue foreclosure under state law—rather than allowing it to consume estate resources while providing nothing in return.

## FACTUAL BACKGROUND

### A.    The Chapter 11 Case and Appointment of Trustee

2.    On January 8, 2025 (the "**Petition Date**"), Chabad of Gramercy Park (the "**Debtor**") filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"). On December 18, 2025, the Bankruptcy Court entered an order directing the United States Trustee to appoint a chapter 11 trustee pursuant to Section 1104 of the Bankruptcy Code, and Yann Geron was subsequently appointed as Trustee. The Trustee was approved by order dated December 24, 2025.

### B.    The Debtor's Properties and EMG Transfer Agent LLC's Secured Claim

3.    The Sale Motion seeks authorization to sell substantially all of the Debtor's assets, consisting of the Debtor's interests in the following five (5) properties: (a) 12 East 13th Street, Unit COM, New York, New York 10003; (b) 116-118 West 14th Street, First Floor Unit, New York, New York 10011; (c) 121 West 19th Street, New York, New York 10011 in the building known as The

Lion's Head Condominium; (d) 105-107 East 16th Street, New York, New York 10010; and (e) Cooperative Interests in the Cooperative Organization known as 40 W. 22nd St. Fl in the building located at 40 West 22nd Street, New York, New York 10010 (the "**Co-op Interests**"; and together with the properties described in clauses (a) through (d) immediately above, collectively, the "**Properties**").

4.      The Secured Lender and the Trustee assert that: (i) Secured Lender's secured claim (i) is in an amount of no less than $23,588,494.02, secured by liens on the Properties; and (ii) the Secured Lender is "significantly undersecured." *See* Sale Motion ¶19. Fundamentally, such assertions highlight that the Secured Lender and the Trustee do not expect that any cash will be generated from the proposed sale to pay anyone other than the Secured Creditor (and possibly 40 TCC with respect to the Co-op Interests). Such assertions show that the Sale Motion is designed and expected to benefit only the Secured Lender, and that such motion is critically flawed and improper for a host of reasons.

### C.      The Proposed Bidding Procedures

5.      On March 30, 2026, the Trustee and the Secured Lender jointly filed the Sale Motion, seeking approval of bidding procedures to govern an auction for the sale of the Properties. The proposed bidding procedures provide, among other things, that: (i) the Trustee shall make all determinations regarding whether bids are qualified "with the consent of the Secured Lender"; (ii) the Secured Lender is automatically deemed a "Qualifying Bidder" without regard to any bidding requirements; (iii) the Secured Lender may credit bid the full amount of its secured claim; and (iv) the Trustee, "with the consent of the Secured Lender", shall determine the highest or best bid.

## ARGUMENT

**I.     THE PROPOSED BIDDING PROCEDURES ARE UNREASONABLE AND FAIL TO SATISFY THE STANDARDS FOR A FAIR AND COMPETITIVE SALE PROCESS**

6.      Section 363(b) of the Bankruptcy Code provides that, "after notice and a hearing", a trustee "may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). However, any sale under Section 363 must be based upon the sound business judgment of the trustee and must be conducted through a process designed to maximize value for the benefit of the estate and all creditors -- not merely the interests of the secured creditor.

**A.     The Applicable Legal Standard**

7.      The Second Circuit has established a rigorous standard for approval of Section 363(b) sales. In the seminal case of *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983), the Second Circuit held that "a judge determining a § 363(b) application [must] expressly find from the evidence presented before him at the hearing a good business reason to grant such an application." *Id.* at 1071. Critically, the court held that "there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business." *Id.* at 1070. In making this determination, the court must "consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." *Id.* at 1071. The *Lionel* court emphasized that "[i]n fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups." *Id.* These principles have been consistently reaffirmed by courts in this Circuit. *See, e.g. Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007); *Krys v. Farnum Place, LLC (In re Fairfield Sentry Ltd.)*, 768 F.3d 239, 243 (2d Cir. 2014).

6

8.      As the Second Circuit has further explained, "the bankruptcy court's principal responsibility…is to secure for the benefit of creditors the best possible bid." *In re Fairfield Sentry Ltd.*, 768 F.3d at 246-247. Bankruptcy courts have "broad discretion and flexibility to enhance the value of the estates before it", but this discretion must be exercised to benefit all creditors, not merely a single secured creditor, such that the court secured the best possible bid. *Consumer News & Bus. Channel P'ship v. Fin. News Network Inc. (In re Fin. News Network Inc.)*, 980 F.2d 165, 169 (2d Cir. 1992).

### B.      The Proposed Bidding Procedures Are Fundamentally Flawed

9.      The bidding procedures proposed in the Sale Motion are fundamentally flawed and will not maximize value for the estate. Rather, they are designed to chill competitive bidding and ensure that the Secured Lender obtains the Properties through a credit bid at the lowest possible cost. The material procedural defects include the following:

### (i)      The Secured Lender Exercises Excessive Control Over the Bidding Process

10.      The proposed bidding procedures grant the Secured Lender inappropriate control over every stage of the sale process. The Trustee is required to obtain "the consent of the Secured Lender" for virtually all material decisions, including: (a) determining whether a potential bidder even qualifies as a "Qualifying Bidder"; (b) determining whether a bid constitutes a "Qualifying Bid"; (c) selecting the highest or best bid at the Auction (as defined in the bidding procedures); (d) designating the Successful Bidder and Back-Up Bidder (as defined in the bidding procedures); and (e) modifying the bidding procedures or extending deadlines.

11.      This arrangement improperly gives the Secured Lender veto power over all aspects of the sale process, including the ability to exclude potential and actual competing bidders it deems undesirable. Such control is fundamentally inconsistent with a fair and open auction process designed to maximize value for the estate. As the Bankruptcy Court for the Western District of New

7

York observed in *In re Diocese of Buffalo*, 637 B.R. 701 (Bankr. W.D.N.Y. 2022), bidding procedures that allow a party to "reject any sale other than to the stalking horse" or to reject bids "for any reason" serve only "to discourage competition." *Id.* at 707. Here, the Secured Lender's involvement in determining whether competing bids qualify creates an inherent conflict of interest that undermines the integrity of the sale process.

### (ii)      Secured Lender's Unrestricted Credit Bid Right Chills Competitive Bidding

12.      Section 363(k) of the Bankruptcy Code provides that a secured creditor may credit bid at a sale of its collateral "unless the court for cause orders otherwise." 11 U.S.C. § 363(k). While the Supreme Court has affirmed that secured creditors generally have the right to credit bid, *see RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012), this right is not absolute and may be limited or denied "for cause." 11 U.S.C. § 363(k).

13.      Here, the Secured Lender's unrestricted right to credit bid the full face-value of its approximately $24 million claim will substantially chill competitive bidding. The movants seek to conduct a naked auction for the five (5) Properties at minimum bids of $1.75 million to $4.75 million per property, while the Secured Lender asserts a $24 million secured claim. Potential third-party bidders, who must pay cash for the Properties, will certainly be deterred from participating since they know the Secured Lender can simply outbid them by crediting amounts it need not actually pay. This dynamic is particularly problematic where the Secured Lender (i) controls the bidding procedures, (ii) has the power to determine whether competing bids are "qualified," and (iii) has asserted that each Property is worth substantially less than the Secured Lender's claim amount. Under these circumstances it is not reasonable to expect that any third party would invest time, effort and money needed to investigate and diligence the Properties in order to bid. *See, e.g., In re Diocese of Buffalo*, 637 B.R at 704-705 (denying a sale motion and concluding "Why would anyone incur

8

the cost of participating?"). In short, the whole structure of the sale is facially defective as it is designed such that no third-party bids will be obtained, the Secured Lender will acquire the Properties via a credit bid, and the estate will receive no cash.

14.    Courts have recognized that "cause" to limit credit bidding under Section 363(k) is to be determined on a case to case basis and includes situations where credit bidding would chill competitive bidding and reduce the overall value of the sale. *See, e.g. In re Weiss Multi-Strategy Advisers LLC*, 665 B.R. 578, 592-593 (Bankr. S.D.N.Y. 2024); *In re Aéropostale, Inc.*, 555 B.R. 369, 414-15 (Bankr. S.D.N.Y. 2016)) ("Intrinsically, acting 'for cause' looks to the court's equity powers that allow the court to balance the interests of the debtor, its creditors, and the other parties of interests in order to achieve the maximization of the estate and an equitable distribution to all creditors."). *In re Colad Group, Inc.*, 324 B.R. 208, 222 (Bankr. W.D.N.Y. 2005) (secured creditors may not use the bankruptcy process to "enhance the amount of [a] credit bid" through practices that "can only work to chill the prospects for competitive bidding" and "jeopardize the possibility of a surplus that might inure to the benefit of unsecured creditors.").

15.    For these reasons, the Court should exercise its discretion to limit or condition the Secured Lender's credit bid right to ensure a fair and competitive auction that maximizes value for all creditors.

### (iii)    The Marketing Timeline is Materially Inadequate

16.    The proposed timeline does not provide sufficient time for potential bidders to conduct adequate due diligence and prepare meaningful bids. The Bid Deadline of May 6, 2026, at 12:00 p.m. (ET) -- is only two (2) weeks after the hearing on the Sale Motion, and the Auction scheduled for May 18, 2026 -- is less than 30 days after such hearing. Thus, the marketing period does not allow potential bidders adequate time to evaluate and diligence the Properties, secure

financing, and prepare competitive offers. Moreover, the Trustee may extend deadlines only "with the consent of the Secured Lender", giving the Secured Lender the ability to manipulate timing to its advantage while preventing extensions that might benefit other bidders.

17. The United States Bankruptcy Court for the Southern District of New York has established detailed guidelines for the conduct of asset sales under Section 363(b). *See In re Giftcraft Ltd.*, 672 B.R. 173, 180 (Bankr. S.D.N.Y. 2025) (discussing General Order M-383 and guidelines for asset sales). These guidelines recognize the importance of adequate marketing and notice to ensure competitive bidding. As the Bankruptcy Court for the Western District of New York has observed, "if the debtor chooses to sell property, it must adopt a sales process that is reasonably designed to achieve the greatest net return." *In re Diocese of Buffalo*, 637 B.R. at 703.

18. The compressed timeline undermines this objective and is designed to benefit the Secured Lender at the expense of competitive bidding. The Sale Motion provides no explanation as to why such a short marketing period is needed rather than a typical three to four month marketing period for the sale of real estate. A sale on less than fourteen (14) days' notice is manifestly unreasonable.

## II.    THE ABSENCE OF A STALKING HORSE BIDDER DEPRIVES THE ESTATE OF A PRICE FLOOR AND COMPETITIVE TENSION

19. The Sale Motion seeks approval of "Stalking Horse Bidder protections," including a break-up fee not to exceed two percent (2%) of any stalking horse purchase price. However, critically, *there is no stalking horse bidder*. The Trustee merely "reserves his right" to enter into an agreement with a stalking horse bidder at some unspecified future date.

### A.    The Purpose and Requirements of Stalking Horse Bidder Protections

20. The purpose of stalking horse bidder protections is to compensate the *initial* bidder who serves as a catalyst or "stalking horse" which "placed the estate property in a sales configuration

mode ... to attract other bidders to the auction." *Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources),* 147 B.R. 650, 659 (S.D.N.Y. 1992). As the Second Circuit has explained, "[b]reakup fees are sometimes authorized in the bankruptcy auction sale context because they provide an incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders." *Gey Assocs. Gen. P'ship v. 310 Assocs. (In re 310 Assocs.)*, 346 F.3d 31, 34 (2d Cir. 2003). "The breakup fee compensates the stalking horse for the risk it shoulders in being the first bidder." *Id.*

21.     Courts in this Circuit have established specific criteria for approving break-up fees. In *In re Integrated Resources*, the court identified three questions for assessing break-up fees: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; (3) is the amount of the fee unreasonable relative to the proposed purchase price?" 147 B.R. at 657; *see also In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014) (applying same standard).

**B.     The Motion Should Not Be Approved Without an Actual Stalking Horse Bidder**

22.     The Sale Motion should not be approved without an actual stalking horse bidder for each of the Properties. That is the only way the Court can be assured that the sale is not designed to convey the Properties to the Secured Lender. Here, no stalking horse bidder has been obtained, and the sale is a "naked auction." The Sale Motion fails to set forth any factual support as to why the sale must be conducted via a naked auction.[1]

23.     Without an actual stalking horse bidder, the estate is deprived of a "floor" for bidding and there is no meaningful competitive tension to encourage higher bids.

24.     Moreover, the Court should not approve break-up fees in the abstract without an

---

[1] As set forth in Paragraph 33 below, case law makes clear that the movants cannot present such explanation for the first time in any reply papers.

25.     actual proposed stalking horse. As the Bankruptcy Court for the Western District of New York observed in *In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009), "[a] bankruptcy court will approve breakup fees that serve the best interests of the estate and that are otherwise fair. Fairness compels that such fees provide no windfall, but that they instead represent a reimbursement for costs and expenses that the stalking horse reasonably incurred either in formulating its offer or in facilitating the bid process."

26.     Seeking approval of bidder protections in the absence of an actual stalking horse bidder is premature and inappropriate. The Court should not pre-approve break-up fees and other protections when there is no bidder to whom such protections would apply and no "floor" price has been established.

27.     If and when a stalking horse bidder is identified, the Trustee can seek approval of appropriate protections at that time, with proper notice to creditors and parties in interest and an opportunity to evaluate whether the proposed protections satisfy the standards established by this Circuit.

## III.    THE MOVANTS HAVE FAILED TO SATISFY THE *LIONEL* STANDARD AND THE PROPOSED SALE CONSTITUTES AN IMPERMISSIBLE *SUB ROSA* PLAN

### A.    The Movants Have Failed to Satisfy the *Lionel* Standard for a Section 363 Sale Outside of a Confirmed Plan

28.     As set forth in Section I.A above, the Second Circuit's *Lionel* standard requires that a bankruptcy court expressly find "a good business reason" for approving a Section 363 sale, and that "there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business." 722 F.2d at 1070-71. The court must "consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." *Id*. at 1071.

12

29.     The Sale Motion is fatally deficient under *Lionel* because it fails to provide any articulated business justification for proceeding outside of a confirmed plan. While the Sale Motion asserts in paragraph 37 that "[t]he Trustee's decision to consummate the Sales represents a reasonable exercise of his business judgment," this conclusory statement offers no explanation as to what such judgment is based on, why the sale cannot proceed through a confirmed plan, or why it must be conducted as a naked auction on a materially shortened timeline with bids due only two weeks after the hearing. The Sale Motion identifies no exigent circumstances, impending deterioration of asset value, financing contingencies, or other time-sensitive factors that would justify bypassing the plan confirmation process.

30.     This silence is deafening. Further, it is particularly striking given that the Trustee has acknowledged his intent to file a plan of liquidation with an estimated effective date of approximately May 31, 2026 -- only weeks away. If a plan is imminent, there is no articulated reason why the sale of substantially all of the Debtor's assets cannot be conducted through that plan -- affording creditors the statutory protections Congress mandated and preserving the estate's entitlement to transfer tax exemptions under Section 1146(a).

31.     In short there is *nothing* in the Sale Motion that would permit this Court to find that the *Lionel* requirement has been met.

32.     As the Second Circuit held in *Lionel*, "the only reason advanced for granting the request . . . was the Creditors' Committee's insistence on it," and the court found this "insufficient as a matter of fact because it is not a sound business reason and insufficient as a matter of law because it ignores the equity interests required to be weighed and considered under Chapter 11." 722 F.2d at 1071. Here, the movants have advanced no reason at all-- not even the impermissible justification of creditor appeasement that *Lionel* rejected.

13

33.    Moreover, the movants cannot cure this defect by submitting a justification for the first time in reply papers. *See, e.g. Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999) (Second Circuit rejected an attempt in the reply brief to supply what was conspicuously omitted in the opening brief); *In re Beinhauer*, 570 B.R. 128, 134 n.9 (Bankr. E.D.N.Y. 2017) (court refused to consider the trustee's new arguments made for the first time in a reply brief); *In re Jensen*, 2010 WL 424693 at *2 (Bankr. S.D.N.Y. Feb. 3, 2010) (court rejected debtor's argument made for the first time in reply papers); New arguments raised in reply briefs deny the opposing party an opportunity to properly respond to such arguments. *U.S. Underwriters Ins. Co. v. Falcon Constr. Corp.*, 2006 WL 3146422 at *3 (S.D.N.Y. Oct. 30, 2006).

34.    For this reason alone, the Sale Motion should be denied.

**B.    The Proposed Sale Constitutes an Impermissible *Sub Rosa* Plan of Reorganization And Previous Creditors The Protections of The Plan Confirmation Process**

35.    Independent of the movants' failure to satisfy the *Lionel* standard, the proposed Section 363 sale constitutes an impermissible sub rosa plan that circumvents the protections afforded to creditors under the plan confirmation process. The Second Circuit has held that a Section 363 sale cannot be used to "short circuit the requirements of Chapter 11 for confirmation of a reorganization plan." *In re Iridium Operating LLC*, 478 F.3d at 466 (quoting *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983)).

36.    As the Second Circuit explained in Iridium: "The reason sub rosa plans are prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in effect, 'short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan.'" *Id*. The Second Circuit further elaborated on this prohibition in *In re Chrysler LLC*, 576 F.3d 108 (2d Cir. 2009), explaining that "the thrust of criticism remains what it was in *Lionel*: fear that one class of creditors

14

may strong-arm the debtor-in-possession, and bypass the requirements of Chapter 11 to cash out quickly at the expense of other stakeholders, in a proceeding that amounts to a reorganization in all but name, achieved by stealth and momentum." *Id.* at 118.

37. The Fifth Circuit's seminal decision in *Braniff* articulated the core concern: "[t]he debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa in connection with a sale of assets." 700 F.2d at 940. As courts have explained, "[a] proposed § 363 sale may be objectionable, for example, when aspects of the transaction dictate the terms of the ensuing plan or constrain parties in exercising their confirmation rights, such as by placing restrictions on creditors' rights to vote on a plan." *In re GMC*, 407 B.R. 463, 493 (Bankr. S.D.N.Y. 2009).

38. The proposed sale effectively dictates the terms of any future plan and preordains the outcome for creditors by disposing of substantially all of the Debtor's valuable assets—five Manhattan real properties that constitute the entirety of the estate's meaningful value—and channeling all proceeds to the Secured Lender. The Secured Lender's unrestricted right to credit bid the full face value of its approximately $24 million claim virtually guarantees that no third-party bidder will succeed at auction. This structure deprives creditors of essential safeguards under the Bankruptcy Code, *including* the disclosure statement requirement, 11 U.S.C. § 1125, the right to vote, 11 U.S.C. § 1126, the "best interests" test, 11 U.S.C. § 1129(a)(7), and the absolute priority rule, 11 U.S.C. § 1129(b)(2). The result is not a sale that benefits the estate -- it is a *de facto* distribution to a single creditor outside the plan confirmation process, precisely the harm the *sub rosa* plan doctrine was designed to prevent. *See Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30, 52 (S.D.N.Y. 2005) ("[I]t is well established that section 363(b) is not to be utilized as a means of avoiding Chapter 11's plan confirmation procedures."),

15

*revs'd* on other grounds, 600 F.3d 231(2d Cir. 2010); *In re Flour City Bagels, LLC*, 557 B.R. 53, 84 (Bankr. W.D.N.Y. 2016) (denying a 363(b) sale where there was insufficient justification for a sale outside of the plan process).

39.    As the Second Circuit observed in *Chrysler*, the concern is "that one class of creditors may strong-arm the debtor-in-possession, and bypass the requirements of Chapter 11 to cash out quickly at the expense of other stakeholders, in a proceeding that amounts to a reorganization in all but name, achieved by stealth and momentum." 576 F.3d at 118. That is precisely what is occurring here.

40.    For these reasons, the proposed sale constitutes an impermissible *sub rosa* plan that should be denied. The sale of the Properties should instead be conducted through a confirmed plan of reorganization or liquidation under 11 U.S.C. § 1123, which would preserve the protections of the plan confirmation process for all creditors—including disclosure of "adequate information", voting, the "best interests" test, and the absolute priority rule—and preserve the estate's right to exemption from transfer taxes under 11 U.S.C. § 1146(a).

41.    By proceeding through a Section 363 sale rather than a plan, the Sale Motion deprives creditors of these fundamental protections. The Debtor's creditors -- including unsecured creditors, priority claimants, and administrative expense holders -- are entitled to participate in and vote on any transaction that will effectively determine their recoveries.

42.    As the court in *Flour City Bagels, LLC* recognized:

> Because a § 363 sale is not subject to the requirements of disclosure and voting that attend a plan confirmation process, its use is circumscribed. . . . The concern raised by such pre-confirmation sales is that they risk deny[ing] creditors the statutory protections they would otherwise receive through the Chapter 11 confirmation process.

557 B.R. at 77.

16

C.        **The Trustee Will Propose a Plan of Liquidation Shortly**

43.      The Trustee has indicated that he intends to file a plan of liquidation in this case, with an estimated effective date of approximately May 31, 2026. Rather than rushing to conduct a Section 363 sale (with a minimal marketing period and pursuant to terms that discourage third party bids) that will predetermine the outcome, the sale of the Properties should be incorporated into, and conducted pursuant to, a confirmed plan of liquidation. This approach would ensure that all stakeholders have an opportunity to participate in the process through disclosure, voting, and the confirmation safeguards of Chapter 11, and that the sale is conducted in a manner consistent with the Bankruptcy Code's priority scheme.

## IV.    A SALE THROUGH A CONFIRMED PLAN WOULD QUALIFY FOR TRANSFER TAX EXEMPTIONS

44.      Conducting the sale through a confirmed plan of reorganization would provide a substantial benefit to the estate: exemption from transfer taxes under Section 1146(a) of the Bankruptcy Code. Section 1146(a) provides that "[t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 . . . may not be taxed under any law imposing a stamp tax or similar tax." 11 U.S.C. § 1146(a).

A.        **The Second Circuit Has Broadly Interpreted the Section 1146(a) Exemption**

45.      The Second Circuit has held that this exemption applies when a transfer is integral to the implementation or consummation of the confirmed plan. In *In re Jacoby-Bender, Inc.*, 758 F.2d 840 (2d Cir. 1985), the Second Circuit affirmed that a transfer was exempt from the New York City Real Property Transfer Tax because "the plan's consummation depended almost entirely upon the sale of the building." *Id.* at 841. The court rejected the argument that the exemption requires the plan to include specific details about the transfer, emphasizing that "Congress's apparent purpose in enacting section 1146 was to facilitate reorganizations through giving tax relief, a purpose served

17

equally well when the reorganization plan leaves details to be settled in the future." *Id.*

46.     The Bankruptcy Court for the Eastern District of New York has similarly held that where a transfer is "essential to the confirmation of the plan", it qualifies for the Section 1146(a) exemption even if the plan does not explicitly describe the transfer. *In re Permar Provisions, Inc.*, 79 B.R. 530, 534 (Bankr. E.D.N.Y. 1987) (citing *Jacoby-Bender*). As the Southern District of New York has explained, Section 1146 "does not require[e] that the reorganization plan include specifics…Congress's apparent purpose in enacting section 1146 was to facilitate reorganization through giving tax relief, a purpose served equally well when the reorganization plan leaves details to be settled in the future." *In re 1515 Broadway Assocs., L.P.*, 153 B.R. 400, 410 (S.D.N.Y. 1993).

### B.     A Section 363 Sale Would Not Qualify for the Exemption

47.     By contrast, a Section 363 sale conducted outside of a confirmed plan does not qualify for the Section 1146(a) exemption.  *See In re Complete Retreats, LLC*, 358 B.R. 822, 823-824 (Bankr. D. Conn. 2006) ("The plain language of § 1146(a) limits the applicability of a tax exemption to sales and other transactions that are 'under a plan confirmed'.").

### C.     A Sale Pursuant to a Confirmed Will Provide Material Tax Savings

48.     The Properties at issue are valuable Manhattan real estate. The transfer taxes that would be incurred in a Section 363 sale -- but avoided in a sale under a confirmed plan --will be substantial. Indeed, the combined New York State and New York City real property transfer taxes will likely exceed 2.5% of the consideration for transfers of real property. For properties valued at approximately $24 million (or more), this represents a potential savings to the estate of hundreds of thousands of dollars. This significant benefit to the estate would be forfeited if the sale is conducted outside of a confirmed plan, and the Sale Motion fails to address this consideration in any way whatsoever.

18

## V.   THE PROPOSED SALE IS STRUCTURED TO BENEFIT SOLELY THE SECURED LENDER

49.    The proposed sale is structured in a manner that benefits the Secured Lender to the exclusion of all other stakeholders in the estate.  The Sale Motion makes clear that all sale proceeds will flow to the Secured Lender (and 40 TCC with respect to the Co-op Interests), leaving nothing for other creditors. This structure effectively constitutes a *sub rosa* plan that impermissibly dictates the terms of a distribution scheme outside the plan confirmation process.

50.    As detailed in Section I.B above, the proposed bidding procedures grant the Secured Lender inappropriate control over every stage of the sale process, requiring the Trustee to obtain "the consent of the Secured Lender" for virtually all material decisions. This arrangement improperly gives the Secured Lender veto power over the sale process, fundamentally inconsistent with a fair and open auction designed to maximize value for the estate.

51.    The Second Circuit has expressly warned against allowing sales that serve the interests of particular creditors at the expense of others. In *Lionel*, the court held that "there must be some articulated business justification, other than appeasement of major creditors" for a Section 363 sale, and reversed a sale where "the only reason advanced for granting the request . . . was the Creditors' Committee's insistence on it." 722 F.2d at 1070-71. Here, there is no discussion in the Sale Motion as to why the sale is not being done after a plan is confirmed.[2]

### B.    The Sale Constitutes a *De Facto* Distribution to the Secured Lender

52.    As discussed in Sections I.B.(ii) and III.B above, the Secured Lender's unrestricted right to credit bid the full face value of its approximately $24 million claim virtually guarantees that no third-party bidder will succeed at auction. If no third-party bidders submit qualifying bids, the

---

[2] Moreover, it is too late to do so as the movants may not present such new argument for the first time in a reply. *See* Paragraph 33 *supra*.

Properties will be transferred to the Secured Lender without any cash being generated for the estate. This is not a sale that benefits the estate -- it is a *de facto* distribution of estate assets to a single creditor outside of the plan confirmation process.

### C.    Other Creditors Will Receive Nothing

53.    If the Secured Lender acquires the Properties through a credit bid, no cash will be generated for the estate.

54.    All other creditors -- including administrative expense claimants, priority claimants, and unsecured creditors -- will be left with nothing. The Second Circuit has emphasized that a bankruptcy court must "consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." *In re Lionel*, 722 F.2d at 1071. Here, the Sale Motion furthers the interests of only the Secured Lender, while providing no benefit to other stakeholders. This one-sided structure does not satisfy the *Lionel* standard and should not be approved.

### D.    Trustee Failed to Set Forth a Business Justification for a Section 363 Sale Rather Than a Sale Pursuant to a Plan of Reorganization

55.    As discussed in Section III.A above, the Sale Motion is fatally deficient under *Lionel* because it fails to provide any articulated business justification for proceeding outside of a confirmed plan.

56.    As noted above, the movants cannot cure this defect by submitting a justification for the first time in reply papers. See Paragraph 33 *supra.*

57.    For this reason alone, the Sale Motion should be denied.

## VI.    THE SALE MOTION FAILS TO DEMONSTRATE ANY TANGIBLE BENEFIT TO THE GENERAL CREDITOR BODY

58.    The Sale Motion fails to demonstrate any tangible benefit to the general creditor

body. Approving the sale under these circumstances would be inequitable and contrary to the fundamental purposes of Chapter 11.

### A.    No Benefit to Unsecured Creditors

59.    The entire sale structure contemplates that all proceeds will flow to the Secured Lender, leaving nothing for other creditors. The Sale Motion does not identify any benefit that will accrue to the estate or its creditors (other than the Secured Lender and, perhaps 40 TCC, as to the Co-op Interests) from conducting this sale. This is the antithesis of the "good business reason" required under *Lionel* and its progeny.

60.    As the Second Circuit has held, "the bankruptcy court's "principal responsibility… is to secure for the benefit of creditors the best possible bid.'" *In re Fairfield Sentry Ltd.*, 768 F.3d at 246 (Second Circuit reversed and remanded an order approving a Section 363 sale).

61.    Here, even if the "best possible bid" is obtained, it will provide no benefit to any creditor other than the Secured Lender. There is no sound business justification for expending estate resources on a sale process that will not benefit the estate.

### B.    The Estate Will Incur Administrative Expenses Without Any Return

62.    Conducting the proposed sale will require the estate to incur significant administrative expenses—including professional fees, Trustee fees, broker commissions, and other costs—all for a sale that will generate no cash for the estate if the Secured Lender credit bids. These administrative expenses will simply increase the deficiency claim of the Secured Lender while providing no corresponding benefit to other creditors. This result is inequitable and contrary to the purposes of Chapter 11.

21

## VII.    THE COURT SHOULD REQUIRE A MEANINGFUL CARVE-OUT FOR CREDITORS

63.    As a condition of any sale approval, the Court should require a meaningful carve-out from sale proceeds for the benefit of all creditors. The Sale Motion and proposed bidding procedures fail to provide any carve-out from sale proceeds for payment of administrative expenses or distributions to unsecured creditors.

### A.    The Existing Carve-Out Is Inadequate

64.    The Approved Cash Collateral Stipulation is entirely inadequate. It was entered a year ago while the Debtor was operating and provides for a limited carve-out only for, among other items, "the amounts necessary to satisfy all allowed fees and expenses incurred by persons or firms retained by the Debtor whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328, and 1103 of the Bankruptcy Code up to a maximum amount of \$40,000."

65.    The Sale Motion provides no carve-out whatsoever for payment to administrative creditors or general unsecured creditors. The entire sale structure contemplates that all proceeds will flow to the Secured Lender, leaving nothing for other creditors.

### B.    The Court Should Require a Meaningful Carve-Out

66.    The Court should deny the Sale Motion unless and until the Secured Lender agrees to a meaningful carve-out that provides for: (a) reserve for all administrative expenses through the closing of the case; and (b) a meaningful distribution to unsecured creditors.

67.    Such a carve-out is necessary to ensure that the administrative machinery of the bankruptcy process functions properly, and that there is some benefit to creditors other than the Secured Lender.

22

## VIII.  IN THE ALTERNATIVE, THE COURT SHOULD LIFT THE STAY AND PERMIT FORECLOSURE

68.     If the Secured Lender is unwilling to consent to a meaningful carve-out for administrative expenses and unsecured creditors, then the proposed sale provides no benefit to the estate or its creditors.  In that circumstance, the Court should deny the Sale Motion and, instead, lift the automatic stay to permit the Secured Lender to foreclose on the Properties through state law procedures, rather than consuming estate resources through a Section 363 sale that yields nothing for the estate.

69.     If the proposed sale will generate no cash for the estate because the Secured Lender will simply credit bid, then there is no benefit to conducting the sale through the bankruptcy process. The estate will incur administrative expenses—including, without limitation, professional fees, Trustee fees, broker commissions -- for a sale that produces nothing for creditors other than the Secured Lender. If the Secured Lender wants the benefit of a bankruptcy sale—including the ability to acquire the Properties free and clear of liens under Section 363(f) and the protections of Section 363(m)—it should be required to fund a meaningful carve-out that provides some benefit to the estate and its creditors. The bankruptcy process should not be used merely as a vehicle for the Secured Lender to quickly obtain a "cleansed" title to the Properties without providing any corresponding benefit to the estate.

## CONCLUSION

WHEREFORE, the Objecting Party respectfully requests that this Court enter an order:

(1)     Denying the Sale Motion in its entirety; or in the alternative,

(2)     Denying the Sale Motion until such time as a stalking horse bidder is obtained for each of the Properties; or in the alternative

(3)     Modifying the proposed bidding procedures to:

(a)    Eliminate the requirement that the Trustee obtain the Secured Lender's consent for material decisions regarding the bidding process, including the determination of qualified bidders and the selection of the successful bidder;

(b)    Limit or condition the Secured Lender's right to credit bid for cause, pursuant to 11 U.S.C. § 363(k);

(c)    Extend the timeline for marketing and due diligence to allow potential bidders adequate time to evaluate the Properties, secure financing, and prepare competitive bids;

(d)    Deny approval of stalking horse bidder protections until an actual stalking horse bidder has been identified and the proposed protections can be evaluated under the standards established by this Circuit; and

(e)    Require a carve-out from sale proceeds for all administrative expenses, professional fees, and a meaningful distribution to unsecured creditors; or in the alternative

(4)    Directing that any sale of the Properties be conducted through a confirmed plan of reorganization or liquidation under 11 U.S.C. § 1123, thereby:

(a)    Preserving the protections of the plan confirmation process for all creditors, including disclosure, voting, the "best interests" test, and the absolute priority rule; and

(b)    Preserving the estate's right to exemption from transfer taxes under 11 U.S.C. § 1146(a);

(5)    In the alternative, if the Secured Lender refuses to consent to a meaningful carve-out that provides some benefit to the estate, including administrative and unsecured creditors, granting relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(2)  to permit the Secured Lender to foreclose on the Properties through state law procedures, rather than consuming estate resources on a Section 363 sale that provides no benefit to the estate; and

24

(6)     Granting such other and further relief as the Court deems just and proper.


Dated: April 15, 2026
       New York, New York

KATSKY KORINS LLP

By:     /s/ Steven H. Newman
         Steven H. Newman
605 Third Avenue
New York, New York 10158-0038
(212) 953-6000

*Attorneys for 211 Thompson Owners Corp.*

25