UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| Chabad of Gramercy Park, | Case No. 25-40105-jmm |
| Debtor. | |

**CHAPTER 11 LIQUIDATING PLAN FOR THE DEBTOR**
**FILED BY EMG TRANSFER AGENT LLC**

EMG Transfer Agent LLC hereby proposes the following chapter 11 liquidating plan for Chabad of Gramercy Park, pursuant to section 1121(c) of the Bankruptcy Code.

## ARTICLE I
## Definitions

The following terms shall have the respective meanings set forth below. Unless otherwise indicated, the singular shall include the plural. Any term not defined herein which is defined by the Bankruptcy Code shall have the meaning ascribed to it in the Bankruptcy Code.

1.1 "12 E 13" means the real property located at 12 East 13th Street, Unit COM, New York, New York 10003, which is a condominium unit.

1.2 "12 E 13 Condo" means the Board of Managers of 12 East 13th Street Condominium, which is the condominium association responsible for maintaining 12 E 13.

1.3 "12 E 13 Condo Pre-Petition Claim" means the proof of claim filed by 12 E 13 Condo on November 24, 2025, which claim was assigned Claim No. 26-1 and asserts a secured claim in the amount of $17,057.65 as of the Filing Date.

1.4 "40 TCC" means the cooperative organization known as 40 West 22nd Street Tenants Cooperative Corporation.

1.5 "40 TCC Building" means the real property commonly known as 40 West 22nd Street, New York, New York 10010.

1.6 "40 TCC Lease" means that certain proprietary lease dated as of August 4, 2010, between 40 TCC, as lessor, and the Debtor, as lessee, pursuant to which the Debtor leased the ground floor unit in the 40 TCC Building.

1.7 "105-07 E 16" means the real property located at 105-07 East 16th Street, Commercial Unit, New York, New York 10003, which includes a condominium unit on the ground floor of the property.

1.8 "105-07 E 16 Condo" means the Board of Managers of 105-07 East 16th Street Condominium, which is the condominium association responsible for maintaining 105-07 E 16.

1.9 "116-118 W 14" means the real property located at 116-118 West 14th Street, First Floor Unit, New York, New York 10011.

1.10 "121 W 19" means the real property located at 121 West 19th Street, Commercial Unit, New York, New York 10011, which is a condominium unit in the building known as and by Lion's Head Condominium.

1.11 "211 TOC" means 211 Thompson Owners Corporation, the owner of the 211 TOC Building and landlord under the 211 TOC Lease.

1.12 "211 TOC Building" means the cooperative apartment building located at 211 Thompson Street, New York, New York.

1.13 "211 TOC Lease" means that certain lease dated January 20, 2014, between 211 TOC, as landlord, and the Debtor, as tenant, pursuant to which the Debtor leased certain commercial space at the 211 TOC Building consisting of portions of the ground, mezzanine and basement floors.

1.14 "211 TOC Pre-Petition Claim" means the proof of claim filed by 211 TOC on June 6, 2025, which claim was assigned Claim No. 20-1 and is filed in the amount of $1,045,934.50 and consists of an asserted (a) secured claim in the amount of $70,272.74 based on a security deposit that it possessed as of the Filing Date, plus (b) a general unsecured non-priority claim in the amount of $975,661.76.

1.15 "245 E 19 Realty" means 245 E 19th Realty LLC, the owner of the 245 E 19 Realty Building and landlord under the 245 E 19 Realty Lease.

1.16 "245 E 19 Realty Building" means the building located at 245 East 19th Street a/k/a 337 Second Avenue, New York, New York 10003.

1.17 "245 E 19 Realty Lease" means that certain lease dated as of July 31, 2012, as amended from time to time, between 245 E 19 Realty, as landlord, and the Debtor, as tenant, pursuant to which the Debtor leased certain non-residential space at the 245 E 19 Realty Building consisting of Store #3, Store #4 and Cellar, constituting of approximately 6,500 square feet.

1.18 "245 E 19 Realty Pre-Petition Claim" means the proof of claim initially filed by 245 E 19 Realty on April 2, 2025, which claim was assigned Claim No. 16-1 and is filed in the amount of $257,278.81 and consists of an asserted (a) secured claim in the amount of $149,882.63 based on a security deposit that 245 E 19 Realty possessed as of the Filing Date, plus (b) a general unsecured non-priority claim in the amount of $107,396.18, as amended by the proof of claim filed by 245 E 19 Realty on October 1, 2025, which claim was assigned Claim No. 16-2 and filed in the amount of $348,092.69 and asserts (x) a secured claim in the amount of $149,882.63, plus (y) a general unsecured non-priority claim in the amount of $198,210.06.

1.19 "Adequate Protection Superpriority Claim" means the allowed superpriority administrative expense claim, pursuant to sections 503(b) and 507(a) of the Bankruptcy Code,

granted to the Secured Lender in the Cash Collateral Order, as further defined and described in the Cash Collateral Order.

1.20 "Administrative Claim" means a Claim for costs and expenses of administration of the Debtor's Estate pursuant to sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including: (a) to the extent they meet the statutory requirements, the actual and necessary costs and expenses incurred after the Filing Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; (b) Professional Claims; (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; and (d) any fees or charges assessed against the Debtor's Estate under chapter 123, title 28 of the United States Code.

1.21 "Administrative Claim Bar Date" means May 15, 2026, at 5:00 p.m. (prevailing Eastern Time), the date established by the Bankruptcy Court pursuant to the Administrative Claim Bar Date Order by which Administrative Claims arising from the Filing Date (*i.e.*, January 8, 2025) through the Effective Date must be filed; *provided, however*, that the Administrative Claims, if any, of Lion's Head Condo, Union Lane House Condo, 12 E 13 Condo, 105-07 E 16 Condo and Con Edison shall continue to accrue through and including the Confirmation Date.

1.22 "Administrative Claim Bar Date Order" means the *Order Establishing the Deadline for Filing Proofs of Chapter 11 Administrative Claims or Interests Against the Debtor and Designating Form and Manner of Notice* entered on March 29, 2026 [Docket No. 222].[1]

1.23 "Administrative Claim Supporting Party Secured Lender Plan Contribution" means the aggregate cash payment of Two Hundred Fifty Thousand Dollars ($250,000.00) to be made by the Secured Lender pursuant to the Plan Support Agreement for distribution to holders of Allowed

[1] References to "Docket No" herein refer to the Bankruptcy Court's docket in the Chapter 11 Case.

Supporting Party Administrative Claims on a Pro Rata basis in full satisfaction of such Allowed Supporting Party Administrative Claims.

1.24 "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

1.25 "AG Approval" means approval of the Attorney General of the State of New York, as required by the Religious Corporations Law and/or the Not-for-Profit Corporation Law of the State of New York inasmuch as the Debtor is a religious corporation and/or nonprofit organization organized under the laws of the State of New York.

1.26 "Allowed" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a proof of claim filed in accordance with, and subject to the terms of, the Bar Date Order or Administrative Claim Bar Date Order, as applicable; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no proof of claim has been timely filed; or (c) a Claim allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, including a Claim estimated pursuant to section 502(c) of the Bankruptcy Code; *provided, however*, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that (i) no objection to the allowance of such Claim, including an objection to the timeliness of such Claim, has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or (ii) if such an objection is so interposed, such Claim shall have been Allowed by a Final Order. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until (x) such Entity pays in full the amount that it owes to the

Estate, or (y) such Claim is Allowed pursuant to a Final Order of the Bankruptcy Court. "Allow" and "Allowing" shall have correlative meanings.

1.27 "Allowed 40 TCC Secured Claim" means the Allowed Secured Claim of 40 TCC secured by a Lien on and perfected security interest in the Co-op Interests.

1.28 "Allowed General Unsecured Claims" means all General Unsecured Claims to the extent they are Allowed Claims.

1.29 "Allowed Maplewood Secured Claim" means the Secured Claim of Maplewood Lender to the extent it is an Allowed Secured Claim secured by the Maplewood Mortgage.

1.30 "Allowed Priority Claim" means the portion of an Allowed Claim entitled to priority treatment under section 507(a) of the Bankruptcy Code other than an Allowed Priority Tax Claim.

1.31 "Allowed Priority Tax Claim" means the portion of an Allowed Claim entitled to priority treatment under section 507(a)(8) of the Bankruptcy Code.

1.32 "Allowed Priority Tax Claim Carve Out" means the carve out from the Secured Lender's Allowed Secured Claim made available by the Secured Lender from the Initial Closing Date Sale Proceeds to pay Allowed Priority Tax Claims.

1.33 "Allowed Professional Claim" means a Professional Claim: (a) for which a timely proof of claim or request for payment was filed by the Administrative Claim Bar Date with respect to professional fees and expenses incurred prior to the Administrative Claim Bar Date; (b) for which an application for final allowance of any additional or supplemental amounts (including amounts for services rendered or expenses incurred after the Administrative Claim Bar Date or amounts not yet determined as of the Administrative Claim Bar Date) has been filed by the Professional Administrative Claim Bar Date; and (c) which has been approved by the Bankruptcy Court.

1.34 "Allowed Secured Claim" means a Secured Claim to the extent it is an Allowed Claim.

1.35 "Allowed Secured Lender Secured Claim" means the Allowed Secured Claim of the Secured Lender and any assignee thereof.

1.36 "Allowed Supporting Party Administrative Claim" means a Supporting Party Administrative Claim that was timely asserted by filing a proof of claim or request for payment with the Bankruptcy Court by the Administrative Claim Bar Date, and with respect to which no objection to the allowance thereof has been interposed within the period of limitation fixed by the Plan, or as to which any objection has been overruled (and to the extent so overruled) by the Bankruptcy Court. The Allowed Supporting Party Administrative Claims, if any, of Lion's Head Condo, Union Lane House Condo, 12 E 13 Condo, 105-07 E 16 Condo and Con Edison shall continue to accrue through, and including, the Confirmation Date.

1.37 "APA" shall have the meaning ascribed to such term in section 7.4 of the Plan, which shall be in a form substantially similar to Exhibit C to the Plan.

1.38 "Auction" shall have the meaning ascribed to such term in the Bidding Procedures, which are incorporated herein.

1.39 "Avoidance Actions" means any and all claims and causes of action of the Debtor's Estate arising under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code, or any other avoidance or recovery actions available under the Bankruptcy Code, and the proceeds thereof, which the Plan Administrator shall be authorized to pursue for the benefit of the Estate.

1.40 "Bankruptcy Code" means title 11 of the United States Code, §§ 101, *et seq.*, commonly referred to as the Bankruptcy Code.

1.41 "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of New York, or such other court as may have jurisdiction over the Chapter 11 Case.

1.42 "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

1.43 "Bar Date" means the deadlines established by the Bar Date Order for the timely filing of Claims against the Debtor.

1.44 "Bar Date Order" means the *Order Establishing Bar Date for the Filing of Proofs of Claim Against the Debtor, Chabad of Gramercy Park, Pursuant to Bankr. Rule 3003(c)(3)*, which was entered by the Bankruptcy Court on March 21, 2025 [Docket No. 48], and established June 18, 2025, as the "General Bar Date" and August 18, 2025, as the deadline for governmental units to file proofs of claim for Claims arising prior to the Filing Date.

1.45 "Bidding Procedures Order" means the *Order (I) Scheduling a Hearing on the Approval of the Sale of the Debtor's Properties, (II) Approving Certain Bidding Procedures and Stalking Horse Bidder Protections, and the Form and Manner of Notice Thereof, and (III) Granting Related Relief*, entered by the Bankruptcy Court on April 28, 2026 [Docket No. 240].

1.46 "Bidding Procedures" means the *Bidding Procedures*, entered by the Bankruptcy Court on April 28, 2026 [Docket No. 240-1], as Exhibit 1 to the Bidding Procedures Order, as amended in accordance with the terms thereof by notices filed on (a) May 6, 2026 [Docket No. 245], (b) May 19, 2026 [Docket No. 272], (c) June 4, 2026 [Docket No. 274], (d) June 8, 2026 [Docket No. 276], (e) June 15, 2026 [Docket No. 281], (f) July 7, 2026 [Docket No. 282], (g) July 21, 2026 [Docket No. 296], (h) September 9, 2026 [Docket No. 303], and (i) October 16, 2026 [Docket No. 309], as may be further amended, which set forth the procedures for soliciting and evaluating bids for the Sale Assets.

1.47 "Broker" means Ariel Property Advisors LLC, the broker retained by the Chapter 11 Trustee in accordance with the Broker Retention Order, and any other broker who may be retained by order of the Bankruptcy Court or co-broker authorized to market and sell the Sale Assets pursuant to the Sale Order and Article VII of the Plan.

1.48 "Broker Retention Order" means the *Order Authorizing Employment and Retention of Ariel Property Advisors LLC as Real Estate Broker to the Chapter 11 Trustee*, entered by the Bankruptcy Court on March 8, 2026 [Docket No. 217], as may be supplement or amended.

1.49 "Business Day" means any day other than a Saturday, Sunday or legal holiday as defined in Bankruptcy Rule 9006(a).

1.50 "Cash Collateral" shall have the meaning ascribed to such term in section 363 of the Bankruptcy Code.

1.51 "Cash Collateral Order" means the *Revised Stipulation and Final Order (A) Authorizing Debtor's Use of Cash Collateral, (B) Providing Adequate Protection, and (C) Granting Related Relief*, entered by the Bankruptcy Court on May 22, 2025 [Docket No. 94].

1.52 "Causes of Action" means any claims, damages, remedies, causes of action, demands, rights, actions, proceedings, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. For the avoidance of doubt, "Causes of Action" include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest claims or interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through

550, or 553 of the Bankruptcy Code; and (d) claims and defenses such as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

1.53 "Chapter 11 Case" shall mean the above-captioned chapter 11 case commenced by the Debtor on the Filing Date in the Bankruptcy Court, Case No. 25-40105-jmm.

1.54 "Chapter 11 Trustee" means Yann Geron, Esq., solely in his capacity as the chapter 11 trustee of the Debtor's Estate.

1.55 "Chapter 11 Trustee Fee Secured Lender Plan Contribution" means: (a) the aggregate cash payment of Three Hundred Forty-Seven Thousand, Six Hundred Thirty-One Dollars ($347,631.00) to be made by the Secured Lender for distribution of (i) Three Hundred and Twenty-Five Thousand Dollars ($325,000.00) to the Chapter 11 Trustee and Chapter 11 Trustee's Counsel, *plus* (ii) Twenty-Two Thousand, Six Hundred Thirty-One Dollars ($22,631.00) to the Chapter 11 Trustee's Financial Advisor, in full and final satisfaction of the Chapter 11 Trustee's Professionals' Allowed Administrative Claims for the period from the Filing Date through May 31, 2026; *plus* (b) the Secured Lender's carveout from the Initial Closing Date Sale Proceeds of such amounts as may be necessary to pay in full Allowed Administrative Claims, if any, awarded to the Chapter 11 Trustee and Chapter 11 Trustee's Professionals, accruing from and after June 1, 2026, through the Effective Date.

1.56 "Chapter 11 Trustee's Counsel" means Geron Legal Advisors LLC, including its partners, members, principals, attorneys, employees, representatives, and other professionals, together with its successors and assigns.

1.57 "Chapter 11 Trustee's Financial Advisor" means Lindenwood Associates, LLC, including its partners, members, current and former directors, managers, contractors, officers,

equity holders, principals, employees, representatives, and other professionals, together with its successors and assigns.

1.58 "Chapter 11 Trustee's Professionals" means together, the Chapter 11 Trustee's Counsel and the Chapter 11 Trustee's Financial Advisor.

1.59 "Claim" means a claim against the Debtor as defined in section 101(5) of the Bankruptcy Code.

1.60 "Class" means a group of claims or interests, consisting of Claims or Interests which are substantially similar to each other, as classified pursuant to the Plan.

1.61 "Closing" shall have the meaning ascribed to such term in section 7.5 of the Plan.

1.62 "Closing Date" shall have the meaning ascribed to such term in section 7.5 of the Plan.

1.63 "Coffee Shop Occupant" means Ama La Vita, the disputed occupant of a portion of the premises of 121 W 19.

1.64 "Confirmation Date" means the date of entry of the Confirmation Order.

1.65 "Con Edison" means Consolidated Edison Company of New York Inc.

1.66 "Con Edison Administrative Claim" means the Administrative Claim of Con Edison, to the extent it is an Allowed Claim.

1.67 "Confirmation Hearing" means the hearing held by the Bankruptcy Court to determine whether or not the Plan will be confirmed.

1.68 "Confirmation Order" means the order of the Bankruptcy Court approving the Plan under and pursuant to section 1129 of the Bankruptcy Code and related sections thereof.

1.69 "Confirmation Sale Properties" means, collectively, 12 E 13, 105-07 E 16 and any of the other Properties which shall be approved for sale pursuant to the Confirmation Order and the Plan.

1.70 "Co-op Interests" means the Debtor's cooperative interests in 40 TCC pertaining to 45.45 shares of stock for the ground floor unit in the 40 TCC Building.

1.71 "Debtor" means Chabad of Gramercy Park.

1.72 "Debtor Release" means the release set forth in section 13.6 of the Plan.

1.73 "Disbursing Agent" means the Plan Administrator.

1.74 "Disputed Claim" means any portion of a Claim as to which an objection to the allowance thereof has been interposed and not determined pursuant to section 6.1 of the Plan.

1.75 "Disputed Claim Amounts" means, with respect to any Disputed Claim, the lesser of (a) the amount of such Claim as asserted by the holder thereof or (b) such amount as may be estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code.

1.76 "Disclosure Statement" means the disclosure statement relating to the Plan, including all exhibits and schedules thereto, as the same may be amended, modified or supplemented from time to time.

1.77 "Effective Date" means the date that is the first Business Day on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent specified in Article X hereof have been satisfied or waived (in accordance with Article X hereof).

1.78 "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

1.79 "Estate" means the bankruptcy estate of the Debtor created under section 541 of the Bankruptcy Code.

1.80 "Exculpated Parties" means, collectively, and in each case solely in his, her or its

capacity as such: (a) the Chapter 11 Trustee; (b) the Chapter 11 Trustee's Professionals; (c) the Plan Administrator; (d) the Plan Administrator's professionals; (e) the Secured Lender; (f) the Secured Lender's Professionals; and (g) with respect to each of the foregoing Entities, such Entities' respective current Affiliates, and such Entities' and such Affiliates' partners, subsidiaries, predecessors, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), members, principals, employees, agents, managed accounts or funds, advisors, attorneys, accountants, investment bankers, consultants, contractors, representatives, management companies, fund advisors, and other professionals, together with their respective successors and assigns. For the avoidance of doubt, no Exculpated Party shall be exculpated for any act or omission that occurred prior to the Filing Date.

1.81 "Filing Date" means January 8, 2025, the date on which the Debtor filed its chapter 11 bankruptcy petition with the Bankruptcy Court.

1.82 "Final Order" means: (a) an order or judgment of the Bankruptcy Court, as entered on the docket in the Chapter 11 Case (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction; or (b) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Bankruptcy Court (or any other court of competent jurisdiction, including in an appeal taken) in the Chapter 11 Case (or in any related adversary proceeding or contested matter), that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or

resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, or applicable state court rules of civil procedure, may be filed with respect to such order shall not render such order not a Final Order.

1.83 "General Unsecured Claims" means Claims which are not entitled to priority under section 507(a) of the Bankruptcy Code, and which are not Secured Claims or Administrative Claims and includes Allowed Claims, if any, arising from the rejection of an executory contract or unexpired lease.

1.84 "General Unsecured Claim Secured Lender Plan Contribution" means the aggregate cash payment of Ten Thousand Dollars ($10,000.00) to be made by the Secured Lender to fund the Unsecured Claims Reserve for distribution to holders of Allowed General Unsecured Claims on a Pro Rata basis.

1.85 "General Unsecured Disputed Claims Reserve" means the reserve of cash funded by the Secured Lender and maintained by the Plan Administrator on and after the Effective Date in an amount sufficient to pay holders of Disputed Claims that are General Unsecured Claims the distributions to which such holders would be entitled under the Plan if their Disputed Claims were Allowed Claims in their Disputed Claim Amounts, as such reserve may be adjusted from time to time in accordance with the Plan.

1.86 "Impaired" when used with respect to any Claim, Interest or Class, has the same meaning as that contained in section 1124 of the Bankruptcy Code.

1.87 "Initial Closing Date" means the date on which the first Closing of a Sale of a Property occurs.

1.88 "Initial Closing Date Sale Proceeds" means the net Sale Proceeds from the first Property that is sold, after deduction for closing costs and fees.

1.89 "Interests" means the rights, if any, of the equity security holders, if any, in the Debtor.

1.90 "IRS Tax Claim" means the proof of claim filed by the Department of Treasury – Internal Revenue Service on February 20, 2025, which claim was assigned Claim No. 9-1 and filed in the amount of $314,538.53 and asserts (a) a Priority Tax Claim in the amount of $133,453.83, plus (b) a general unsecured non-priority claim in the amount of $181,084.70 as of the Filing Date, as amended by the proof of claim filed by the Department of Treasury – Internal Revenue Service on August 8, 2025, which claim was assigned Claim No. 9-2 and filed in the amount of $210,076.07 and asserts (x) a Priority Tax Claim in the amount of $133,453.83, plus (y) a general unsecured non-priority claim in the amount of $76,622.24.

1.91 "Litigation Claims" shall have the meaning ascribed to such term in section 8.1 of the Plan.

1.92 "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

1.93 "Lion's Head Condo" means the Board of Managers of the Lion's Head Condominium, which is the condominium association responsible for maintaining 121 W 19.

1.94 "Lion's Head Condo Pre-Petition Claim" means the proof of claim filed by Lion's Head Condo on February 28, 2025, which claim was assigned Claim No. 10-1 and asserts a secured claim in the amount of $189,296.56 as of the Filing Date.

1.95 "M&T Bank" means Manufacturers and Traders Trust Company.

1.96 "Maplewood Lender" means Maplewood Garden Holdings LLC.

1.97 "Maplewood Note" means that certain amended and restated purchase money promissory note dated January 17, 2019, in the original principal amount of $420,000.00 by and between Maplewood Lender, as assignee, and Debtor, as borrower.

1.98 "Maplewood Mortgage" means that certain purchase money mortgage (and assignment of leases and rents) and security agreement and financing statement dated January 17, 2019, duly executed and delivered by the Debtor, as mortgagor, to Maplewood Lender, as mortgagee, and such other documents, instruments and agreements executed and delivered by the Debtor, and guarantor thereof, and/or others with respect to the Maplewood Note.

1.99 "Maplewood Property" means the real property located at 48 Maplewood Garden Road, Monticello, New York 12701, which is used as a bungalow colony.

1.100 "Net Avoidance Action Recoveries" means the net proceeds of Avoidance Actions recovered by the Plan Administrator after the deduction of all Post-Effective Date Plan Administrator Litigation Fees, U.S. Trustee Fees and any other costs or fees relating thereto, and the Deferred Chapter 11 Trustee Fees (as defined in section 2.3(a)(ii) below).

1.101 "NYS DOL Claim" means the proof of claim filed by the New York State Department of Labor on January 14, 2025, which claim was assigned Claim No. 2-1 and asserts a priority claim for "Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8)" in the amount of $0.00 as of the Filing Date.

1.102 "Original Lender" means M&T Bank, the original lender under the Secured Lender Loan Documents, which assigned the Secured Lender Loan Documents to the Secured Lender on or about April 5, 2024, and thus holds and has filed no Claim against the Debtor in the Chapter 11 Case.

1.103 "Other Secured Claims" means Secured Claims asserted in the Chapter 11 Case by Entities other than the Secured Lender, 40 TCC and Maplewood Lender, consisting of the Secured Claims: (a) of the SBA, (b) of 211 TOC included in the 211 TOC Pre-Petition Claim in the amount of $70,272.74 (based on a security deposit), (c) of 245 E 19 Realty included in the 245 E 19 Realty Pre-Petition Claim in the amount of $149,882.63 (based on a security deposit), (d) asserted in the Lion's Head Condo Pre-Petition Claim, (e) asserted in the Union Lane House Condo Pre-Petition Claim, and (f) asserted in the 12 E 13 Condo Pre-Petition Claim.

1.104 "Personal Property" means all assets of the Debtor which are not Real Property, and which are not Cash Collateral, accounts receivable, Litigation Claims, proceeds of Litigation Claims or insurance proceeds relating to a casualty concerning Real Property. Personal Property includes, without limitation, the Co-op Interests.

1.105 "Person" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

1.106 "Plan" means the Plan of liquidation, and all exhibits hereto, as the same may be modified or amended from time to time as and to the extent permitted herein or by the Bankruptcy Code.

1.107 "Plan Administrator" means Yann Geron, Esq. or such other Person designated by the Secured Lender prior to the hearing on confirmation of the Plan, as approved by the Confirmation Order.

1.108 "Plan Administrator Agreement" means an agreement governing the Plan Administrator's rights and obligations, substantially in the form annexed hereto as Exhibit A.

1.109 "Plan Support Agreement" means the Plan Support Agreement dated on or around July 31, 2026, or thereafter, by and among the Chapter 11 Trustee, the Secured Lender, and each

Supporting Party, attached hereto as Exhibit B to the Plan, which sets forth the terms under which the Supporting Parties agree to support confirmation of the Plan in exchange for receiving a Pro Rata distribution of (a) the Administrative Claim Supporting Party Secured Lender Plan Contribution plus (b) Net Avoidance Action Recoveries.

1.110 "Post-Confirmation Sale Properties" means, collectively, any Property or Properties that do not have a proposed purchaser as of the Confirmation Date and remain subject to continued marketing and Sale pursuant to the Plan, the Confirmation Order and other orders to be issued by the Bankruptcy Court.

1.111 "Post-Effective Date Plan Administrator Litigation Fees" means all fees and expenses incurred by the Plan Administrator and his professionals after the Effective Date other than Post-Effective Date Plan Administrator Sale and Coffee Shop Fees, including fees incurred in relation to pursuing Avoidance Actions and/or Litigation Claims and fees and expenses incurred in connection with the removal of the Coffee Shop Occupant.

1.112 "Post-Effective Date Plan Administrator Sale and Coffee Shop Fees" means all fees and expenses incurred by the Plan Administrator and his professionals after the Effective Date relating to (a) the Sales of the Properties, or (b) pursuing the Adversary Proceeding against the Coffee Shop Occupant and removing the Coffee Shop Occupant from 121 W 19.

1.113 "Priority Claims" means those Claims that are entitled to priority in payment under section 507(a) of the Bankruptcy Code that are not Administrative Claims or Priority Tax Claims.

1.114 "Priority Tax Claims" means those Claims of governmental units that are entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

1.115 "Pro Rata Share" means with respect to any Class of Claims at any time, the proportion that the amount of a Claim in such Class bears to the aggregate amount of all Claims in

such Class at such time (including Claims that are Disputed Claims at such time). For purposes of each Supporting Party, it means a fraction equal to the dollar amount of that Supporting Party's Allowed Administrative Claim divided by the total dollar amount of all Allowed Supporting Party Administrative Claims held by all Supporting Parties. For purposes of this definition, the amount of a Disputed Claim shall be the amount of such Claim as estimated in accordance with the provisions of Article VI of the Plan.

1.116 "Professional" means any attorney, accountant, appraiser, consultant and other professional retained or to be compensated pursuant to an order of the Bankruptcy Court pursuant to, *inter alia*, section 327, 328, 330, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Case.

1.117 "Professional Administrative Claim Bar Date" means: (a) for Professional Claims arising prior to May 15, 2026, the Administrative Claim Bar Date; and (b) for Professional Claims arising on or after the Administrative Claim Bar Date, thirty (30) days after service of notice of entry of the Confirmation Order or the next Business Day thereafter.

1.118 "Professional Claim" means any claim for compensation and/or reimbursement of expenses under section 327, 328, 330, 331, 363 or 503(b) of the Bankruptcy Code by any Professional retained by order of the Bankruptcy Court accruing prior to the Effective Date, which must be allowed by order of the Bankruptcy Court before payment thereof may be made.

1.119 "Property" means any one of the Properties.

1.120 "Properties" means, collectively, (a) 12 E 13, (b) 105-07 E 16, (c) 116-118 W 14, (d) 121 W 19, and (e) the Co-op Interests.

1.121 "Purchaser" shall have the meaning ascribed to such term in section 7.4 of the Plan.

1.122 "Rabbi" means Rabbi Naftali Rothenstreich.

1.123 "Real Property" means all or any of the following: (a) 12 E 13, (b) 105-07 E 16, (c) 116-118 W 14, and/or (d) 121 W 19.

1.124 "Rejection Claim" shall have the meaning ascribed to such term in section 6.2 of the Plan.

1.125 "Released Claims" means Claims, Causes of Action or other claims that have been released pursuant to the Plan or from which the Exculpated Parties are exculpated pursuant to section 13.8 of the Plan.

1.126 "Released Parties" means each of the following, solely in their capacity as such: (a) the Chapter 11 Trustee, (b) the Chapter 11 Trustee's Professionals, (c) the Secured Lender, (d) the Secured Lender's Professionals, and (e) any purchaser who successfully closes on the Sale of a Property or Sale Assets, including (i) The Downtown Minyan Torah Inc. (or its authorized designee) upon its Closing on the Sale of 105-07 E 16, and (ii) Woodbranch Property Trust (or its authorized designee), upon its Closing on the Sale of 12 E 13.

1.127 "Related Persons" means as to any Person or Entity, such Person's or Entity's current and former direct and indirect equity holders, members, partners, subsidiaries, affiliates, funds, managers, investors, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents and other representatives (including their respective equity holders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents and other representatives).

1.128 "Releasing Parties" means, collectively, and in each case solely in his or its capacity as such: (a) the Debtor, (b) the Chapter 11 Trustee, (c) the Estate, and (d) any other Entity claiming

solely in a derivative capacity by or through each of the foregoing Entities described in clauses (a) through (c), including such Entities' current and former Affiliates, and such Entities' and such Affiliates' partners, subsidiaries, predecessors, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), members, principals, employees, agents, managed accounts or funds, advisors, attorneys, accountants, investment bankers, consultants, contractors, representatives, management companies, fund advisors, and other professionals, together with their respective successors and assigns, in each case in their capacity as such.

1.129 "Reserves" means, collectively, the Supporting Party Disputed Claims Reserve, the General Unsecured Disputed Claims Reserve, the Unsecured Claims Reserve, and the reserves provided for in Section 7.9 below.

1.130 "Sale" means a sale of any Property, Properties or Sale Assets pursuant to Article VII of the Plan.

1.131 "Sale Assets" shall have the meaning ascribed to such term in section 7.1 of the Plan.

1.132 "Sale Order" means the applicable order of the Bankruptcy Court approving the Sale of a particular Property, Properties or Sale Assets to the Purchaser of such Property, Properties or Sale Assets.

1.133 "Sale Proceeds" means the proceeds received by the Plan Administrator from the Sale of any Properties or other Sale Assets.

1.134 "SBA" means the U.S. Small Business Administration.

1.135 "SBA Claim" means the proof of claim filed by the SBA on April 3, 2026, which claim was assigned Claim No. 28-1 and asserts a secured claim in the amount of $168,474.55, as amended on April 8, 2026, which claim was assigned Claim No. 28-2 and also asserts a secured

claim in the amount of $168,474.55, based upon: (a) a note dated July 13, 2020, issued by the Debtor, as borrower, in favor of the SBA, (b) a security agreement dated July 13, 2020, executed by the Debtor in favor of the SBA, and (c) UCC financing statements filed on July 25, 2020, and December 9, 2025, with all of the foregoing (a)-(c) having been entered into or recorded, as applicable, *after* the Secured Lender Loan Documents were entered into and *after* the UCC financing statements issued in connection with the Secured Lender Loan Documents were recorded.

1.136 "Schedules" means the schedules of assets and liabilities as contemplated by Bankruptcy Rule 1007(b), filed by the Debtor with the Bankruptcy Court (as they may be amended from time to time in accordance with Bankruptcy Rule 1009).

1.137 "Secured Claim" means a Claim which is secured by a valid, perfected and enforceable lien on property owned by the Debtor, to the extent of the value of the interest of the holder of such claim in such property as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code, subject to the holder's right to make an election under section 1111(b) of the Bankruptcy Code, to the extent applicable.

1.138 "Secured Lender" means EMG Transfer Agent LLC or any assignee thereof.

1.139 "Secured Lender's Additional Collateral" means, in addition to the Properties, substantially all other assets owned by the Debtor, including all furniture, fixtures, equipment, rents, accounts receivable and other articles of personal property owned by the Debtor and now or hereafter attached to or used in connection with, or with the operation of, any improvements located on the Properties, including all accessories, additions, substitutions, and replacements thereof, together with any and all cash and non-cash proceeds thereof, and all accounts and other personal property owned by the Debtor identified in the Secured Lender Loan Documents.

1.140 "Secured Lender Loan Documents" means: (a) the Secured Lender Note, (b) the Secured Lender Mortgage, (c) that certain general security agreement, dated as of May 27, 2020, by the Debtor in favor of Original Lender, (d) that certain UCC financing statement recorded with the New York Secretary of State on May 22, 2020, under Filing Number 202005220248713, (e) that certain UCC financing statement for the Co-op Interests recorded in the Office of the City Register of the City of New York on May 21, 2020, under City Register File No. 2020000153213, (f) that certain assignment and assumption of loan documents entered into between the Debtor and Original Lender, dated as of April 5, 2024, (g) that certain assignment of mortgage consolidation agreement, dated as of April 5, 2024, duly executed and delivered by Original Lender in favor of Secured Lender, (h) that certain allonge, dated as of April 5, 2024, issued by Original Lender in favor of Secured Lender, (i) all modification agreements and pre-negotiation agreements related to any of the foregoing, and (j) all instruments, documents, and agreements, related to any of the foregoing documents or otherwise related to any of the foregoing, as each of the foregoing may have been subsequently modified, amended, supplemented or otherwise revised from time to time, executed by the Debtor and/or in favor of Original Lender and/or Secured Lender, as applicable.

1.141 "Secured Lender Mortgage" means that certain mortgage and mortgage consolidation, modification, spreader and extension agreement (and assignment of leases and rents), security agreement, fixture filing and financing statement, dated as of May 27, 2020, by and between the Debtor and Original Lender, which secures the Secured Lender Note, which Secured Lender Mortgage was subsequently assigned by Original Lender to Secured Lender on or about April 5, 2024.

1.142 "Secured Lender Note" means that certain consolidated, amended and restated mortgage promissory note dated as of May 27, 2020, in the principal amount of $23,000,000.00,

executed by the Debtor in favor of Original Lender, which note was assigned by Original Lender to Secured Lender on or about April 5, 2024, evidencing the Secured Lender Secured Claim against the Debtor.

1.143 "Secured Lender Plan Contribution" means, collectively: (a) (i) the Administrative Claim Supporting Party Secured Lender Plan Contribution, (ii) the Chapter 11 Trustee Fee Secured Lender Plan Contribution for the period from the Filing Date through May 31, 2026, (iii) the General Unsecured Claim Secured Lender Plan Contribution, and (iv) U.S. Trustee Fees due and owing as of the Effective Date, with the foregoing (a) (i)-(iv) to be funded by the Secured Lender immediately prior to the Effective Date; *plus* (b) (I) the Chapter 11 Trustee Fee Secured Lender Plan Contribution for the period from June 1, 2026, through the Effective Date, (II) such amount as may be necessary to pay the Post-Effective Date Plan Administrator Sale and Coffee Shop Fees, and (III) the Allowed Priority Tax Claim Carve Out, with the foregoing (b) (I)-(III) to be paid from the Initial Closing Date Sale Proceeds due the Secured Lender under the Plan, subject to and in accordance with the terms of the Plan, and which funds shall be used to make distributions under the Plan.

1.144 "Secured Lender's Professionals" means Westerman Ball Ederer Miller Zucker & Sharfstein, LLP, including its partners, members, officers, principals, employees, attorneys, consultants, representatives, and other professionals, together with their respective successors and assigns.

1.145 "Secured Lender Reserves" means any reserves held by the Secured Lender pursuant to the Secured Lender Loan Documents, including without limitation any tax, insurance, replacement and repair reserves, impounds and/or escrows.

1.146 "Secured Lender Secured Claim" means the Claim held by the Secured Lender against the Debtor in the amount, as of the Filing Date, of no less than $23,588,494.02, plus any additional interest, costs and expenses, including legal fees and expenses, accruing from and after the Filing Date, to the extent allowed under the Secured Lender Loan Documents and applicable law, which Secured Lender Secured Claim is evidenced by the Secured Lender Note, Secured Lender Mortgage and other Secured Lender Loan Documents and is secured, subject to the limitations set forth in section 506(a)(1) of the Bankruptcy Code, by first priority Liens on all of the Properties other than the Co-op Interests (with respect to which Co-op Interests the Secured Lender holds a second priority lien, junior only to 40 TCC), and the Secured Lender's Additional Collateral.

1.147 "Substantial Consummation" means the substantial consummation of the Plan.

1.148 "Substantial Consummation Date" means the date of Substantial Consummation of the Plan.

1.149 "Successful Bidder" shall have the meaning ascribed to such term in the Bidding Procedures.

1.150 "Supporting Party" means each holder of an asserted Supporting Party Administrative Claim in the Chapter 11 Case (other than the Chapter 11 Trustee, the Chapter 11 Trustee's Professionals, Con Edison, and the U.S. Trustee) who has executed the Plan Support Agreement, *provided, however*, that execution of the Plan Support Agreement by a Supporting Party does not constitute allowance of such Supporting Party's asserted Supporting Party Administrative Claim, and the Plan Administrator and the Secured Lender reserve all rights to review, object to, or seek to reduce any such asserted claim.

1.151 "Supporting Party Administrative Claims" means those Administrative Claims which are held by a Supporting Party.

1.152 "Supporting Party Disputed Claims Reserve" means the reserve to be established by the Plan Administrator on or as soon as reasonably practicable following the Effective Date from the Administrative Claim Supporting Party Secured Lender Plan Contribution for Supporting Party Administrative Claims that are Disputed Claims, in accordance with section 6.4 of the Plan.

1.153 "Transfer Taxes" means any and all document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, deed, or documentary tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment imposed by any state, county, city or local law, if and as applicable, that may be incurred or arise in connection with the transactions contemplated by the Plan.

1.154 "Union Lane House Condo" means the Board of Managers of the Union Lane House Condominium, which is the condominium association responsible for maintaining 116-118 W 14.

1.155 "Union Lane House Condo Pre-Petition Claim" means the proof of claim filed by the Union Lane House Condo on April 1, 2025, which claim was assigned Claim No. 15-1 and asserts a secured claim in the amount of $12,709.13 as of the Filing Date.

1.156 "Unsecured Claims Reserve" means the reserve, funded by the General Unsecured Claim Secured Lender Plan Contribution, set up pursuant to section 6.4 of the Plan for purposes of distributions to holders of Allowed General Unsecured Claims against the Debtor.

1.157 "U.S. Trustee" means any and all representatives of the Office of the United States Trustee for the Eastern District of New York, Brooklyn Division, with respect to the Chapter 11 Case.

1.158 "U.S. Trustee Fees" shall mean all fees to be paid the U.S. Trustee's office assessed against the Debtor's Estate under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**A. Interpretation; Application of Definitions and Rules of Construction**

Unless otherwise specified, all Article, section or exhibit references in the Plan are to the respective Article or section in, or exhibit to, the Plan, as the same may be amended, waived or modified from time to time as provided for in the Plan. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular Article, section, subsection or clause contained therein. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions except as otherwise required by the Plan; (iii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (iv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be. Nothing in the Plan shall alter, modify, supersede or limit the consent provided or approval rights granted under any orders of the Bankruptcy Court entered in this Chapter 11 Case, all of which remain in full force and effect.

## ARTICLE II
## Treatment of Administrative Claims, Priority Tax Claims, Priority Claims, and Claim of U.S. Trustee

2.1 *Allowed Priority Tax Claims*. The Plan Administrator shall pay Allowed Priority Tax Claims from the Allowed Priority Tax Claim Carve Out, on or as soon as reasonably practicable after the later of: (a) the Initial Closing Date; or (b) the date such Priority Tax Claim becomes an Allowed Claim. The only asserted Priority Tax Claims are: (x) the IRS Tax Claim; and (y) the NYS DOL Claim (which was filed in the amount of $0.00), both of which are disputed by the Chapter 11 Trustee, the Plan Administrator and the Secured Lender and thus are Disputed Claims.

2.2 *Allowed Supporting Party Administrative Claims.* (a) Each holder of an Allowed Supporting Party Administrative Claim shall receive its Pro Rata Share of the Administrative Claim Supporting Party Secured Lender Plan Contribution in cash on or as soon as reasonably practicable after the later of: (i) the Effective Date; or (ii) the date such Supporting Party Administrative Claim becomes an Allowed Claim, in full and final satisfaction, settlement, and release of such Supporting Party's Allowed Supporting Party Administrative Claim (other than such Supporting Party's right to receive its Pro Rata Share of any Net Avoidance Action Recoveries as provided in this section 2.2(a)), as set forth in the Plan Support Agreement. In addition, each holder of an Allowed Supporting Party Administrative Claim shall be entitled to receive its Pro Rata Share of any Net Avoidance Action Recoveries, which amounts shall be distributed as soon as reasonably practicable after such proceeds, if any, are recovered by the Plan Administrator. The Secured Lender has waived any claim to the Net Avoidance Action Recoveries on account of the Secured Lender Secured Claim and Adequate Protection Superpriority Claim, solely for the benefit of the Supporting Parties, conditioned upon the Effective Date occurring. The Plan Administrator shall establish the Supporting Party Disputed Claims Reserve in accordance with section 6.4 of the Plan

for any Supporting Party Administrative Claims that are disputed by the Plan Administrator. The Plan Administrator shall have ten (10) days from the Effective Date to object to or dispute any filed Supporting Party Administrative Claim.

(b) On the Effective Date, or as soon as reasonably practicable thereafter, the Secured Lender shall pay Two Hundred Fifty Thousand Dollars ($250,000.00) to establish the Administrative Claim Supporting Party Secured Lender Plan Contribution to the Disbursing Agent.

(c) Upon receipt of its Pro Rata Share of the Administrative Claim Supporting Party Secured Lender Plan Contribution, each Supporting Party shall be deemed to have settled and released the Debtor, the Debtor's Estate, the Chapter 11 Trustee, the Plan Administrator, the Secured Lender, and each of their respective officers, directors, members, managers, employees, agents, representatives, attorneys, successors and assigns from any and all claims, causes of action, demands, liabilities and obligations of any kind or nature whatsoever arising from or related to such Supporting Party's Supporting Party Administrative Claim, and such Allowed Supporting Party Administrative Claim shall be deemed satisfied, released and discharged in full*; provided, however*, that such Supporting Party shall retain its right to receive its Pro Rata Share of any Net Avoidance Action Recoveries in accordance with section 2.2(a) herein, and such release, satisfaction and discharge shall not impair such right.

(d) The Administrative Claim Bar Date was May 15, 2026, at 5:00 p.m. (prevailing Eastern Time). Pursuant to the Administrative Claim Bar Date Order any Supporting Party Administrative Claim that was not timely asserted by the Administrative Claim Bar Date is disallowed and forever barred without the need for any objection or any other action by the Plan Administrator or the Bankruptcy Court, unless the Plan Administrator, with the consent of the Secured Lender, otherwise agrees to allow such claim; *provided, however*, that the Administrative

Claims, if any, of Lion's Head Condo, Union Lane House Condo, 12 E 13 Condo, 105-07 E 16 Condo and Con Edison shall continue to accrue through and including the Confirmation Date.

(e) The Plan Administrator reserves the right to object to, or seek to reduce, any Supporting Party Administrative Claim that was or was not timely asserted. If the Plan Administrator objects to a Supporting Party Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Supporting Party Administrative Claim should be allowed and, if so, in what amount. The Pro Rata share of the Administrative Claim Supporting Party Secured Lender Plan Contribution allocable to a Supporting Party Administrative Claim that is disputed and the subject of an objection filed by the Plan Administrator shall be held in the Supporting Party Disputed Claims Reserve pending resolution of such Claim.

2.3 *Allowed Administrative Claims of the Chapter 11 Trustee, the Chapter 11 Trustee's Professionals, the Broker and Con Edison*.

(a) Chapter 11 Trustee and Chapter 11 Trustee's Professionals. Subject to confirmation of the Plan, the occurrence of the Effective Date and approval by the Bankruptcy Court, the Chapter 11 Trustee and the Chapter 11 Trustee's Professionals have agreed to the following treatment on account of their Allowed Administrative Claims:

(i) Allowed Administrative Claims incurred from the Filing Date through and including May 31, 2026: For Allowed Administrative Claims incurred during the period from the Filing Date through and including May 31, 2026, the Chapter 11 Trustee and the Chapter 11 Trustee's Counsel have agreed to a voluntary reduction of their Administrative Claims and to accept Three Hundred Twenty-Five Thousand Dollars ($325,000.00) for such period. The Chapter 11 Trustee's Financial Advisor shall be paid the full amount of

its Allowed Administrative Claim for this period. Allowed Administrative Claims of the Chapter 11 Trustee and the Chapter 11 Trustee's Professionals for such period shall be paid in full by the Plan Administrator from the Chapter 11 Trustee Fee Secured Lender Plan Contribution on the later of: (A) the Effective Date; or (B) the date such Claims become Allowed Administrative Claims.

(ii) Allowed Administrative Claims incurred from the June 1 through and including September 30, 2026: For Allowed Administrative Claims incurred during the period from the June 1, 2026 through and including September 30, 2026, the Chapter 11 Trustee and the Chapter 11 Trustee's Counsel have agreed to a voluntary reduction of their Administrative Claims and to accept One Hundred Fifty-Two Thousand Fifteen Dollars and 33/00 ($152,015.33) for such period. Allowed Administrative Claims of the Chapter 11 Trustee and the Chapter 11 Trustee's Counsel for such period shall be paid in full by the Plan Administrator as follows: (A) the sum of One Hundred Two Thousand Fifteen Dollars and 33/00 ($102,015.33) shall be paid from the Chapter 11 Trustee Fee Secured Lender Plan Contribution on the later of: (x) the Initial Closing Date; or (y) the date such Claims becomes an Allowed Administrative Claim, and (b) the sum of Fifty Thousand Dollars ($50,000.00) shall be paid solely from proceeds of recoveries from Avoidance Actions commenced by the Plan Administrator (the "Deferred Chapter 11 Trustee Fees") on the later of: (x) the date the first proceeds are recovered from Avoidance Actions commenced by the Plan Administrator; or (y) the date such Claims become Allowed Administrative Claims. The Chapter 11 Trustee's Financial Advisor shall be paid the full amount of its Allowed Administrative Claim for this period from the Chapter 11 Trustee

Fee Secured Lender Plan Contribution on the later of: (A) the Initial Closing Date; or (B) the date such Claims becomes an Allowed Administrative Claim.

(iii) Allowed Administrative Claims incurred from October 1, 2026, through and including the Effective Date: Allowed Administrative Claims of the Chapter 11 Trustee and the Chapter 11 Trustee's Professionals for the period from October 1, 2026 through and including the Effective Date shall be paid in full by the Plan Administrator from the Chapter 11 Trustee Fee Secured Lender Plan Contribution on the later of: (A) the Initial Closing Date; or (B) the date such Claims become Allowed Administrative Claims.

(b) The Broker. Following the Sale of any of the Properties, the Broker shall file a fee application with the Bankruptcy Court pursuant to sections 327, 328 and 330 of the Bankruptcy Code. The Allowed Administrative Claim of the Broker shall be paid in full by the Plan Administrator from the Sale Proceeds in accordance with the Broker Retention Order and such other orders to be issued by the Bankruptcy Court approving the Broker's Allowed Administrative Claim.

(c) Con Edison. Any Allowed Administrative Claim of Con Edison shall be paid in full by the Plan Administrator from the Sale Proceeds, on the later of: (i) the Initial Closing Date; or (ii) the date such Claim of Con Edison becomes an Allowed Administrative Claim.

2.4 Any and all applications or supplemental applications for the final allowance of Professional Claims for services rendered and expenses incurred on or after the Administrative Claim Bar Date shall be filed with the Bankruptcy Court and served on the Secured Lender and Plan Administrator by the Professional Administrative Claim Bar Date. Any Professional Claim for which a fee application is not filed with the Bankruptcy Court and served on the Secured Lender

and Plan Administrator by the Professional Administrative Claim Bar Date shall be disallowed and forever barred without the need for the filing of an objection to such Claim.

2.5 *Adequate Protection Superpriority Claim*. The Secured Lender waives any right to receive a distribution on account of the Adequate Protection Superpriority Claim, conditioned upon the Plan being confirmed and the Effective Date occurring; *provided*, *however*, that the foregoing waiver shall not affect or impair (a) the Adequate Protection Liens (as defined in the Cash Collateral Order) or the priority thereof, (b) the Secured Lender Secured Claim, or (c) any other right or remedy of the Secured Lender under the Secured Lender Loan Documents, the Cash Collateral Order or applicable law.

2.6 *U.S. Trustee Fees*. On the Effective Date, the Plan Administrator on behalf of the Debtor shall pay from the Secured Lender Plan Contribution all U.S. Trustee Fees which are due and payable as of such date. After the Effective Date, the Plan Administrator on behalf of the Debtor shall reserve and pay from proceeds of sale of the Sale Assets any and all U.S. Trustee Fees when due and payable and shall file with the Bankruptcy Court any and all quarterly reports when they become due in the form and manner prescribed by the U.S. Trustee. The Plan Administrator on behalf of the Debtor shall remain obligated to pay U.S. Trustee Fees to the U.S. Trustee until the earliest of the Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. Notwithstanding anything in the Plan to the contrary, the U.S. Trustee shall not be required to file any proof of claim for quarterly fees and any interest thereon.

## ARTICLE III
## Designation of Claims and Interests

The following Classes of Claims and Interests are designated pursuant to and in accordance with section 1123(a)(1) of the Bankruptcy Code:

3.1 "Class 1 Claim" shall consist of the Allowed 40 TCC Secured Claim against the Debtor.

3.2 "Class 2 Claim" shall consist of the Allowed Maplewood Secured Claim against the Debtor.

3.3 "Class 3 Claim" shall consist of the Allowed Secured Lender Secured Claim against the Debtor.

3.4 "Class 4 Claims" shall consist of the Allowed Other Secured Claims against the Debtor.

3.5 "Class 5 Claims" shall consist of the Allowed General Unsecured Claims against the Debtor.

3.6 "Class 6 Interests" shall consist of the Interests in the Debtor.

## ARTICLE IV
## Claims and Interests Impaired Under the Plan

The Class 1 Claim, Class 3 Claim, Class 4 Claims, and Class 5 Claims are Impaired under the Plan and are entitled to vote on the Plan. The Class 6 Interests are Impaired under the Plan, are not entitled to vote on the Plan, and are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

## ARTICLE V
## Treatment of and Methods of Distribution to Classes Under the Plan

5.1 *Class 1 Claim*. The Class 1 Claim shall be Allowed in the amount of $236,788.67 as of the Filing Date. 40 TCC shall also be allowed monthly maintenance payments, plus reasonable attorneys' fees and disbursements due and owing under the 40 TCC Lease accruing from and after the Filing Date through the Closing Date of the Sale of the Co-op Interests. 40 TCC shall provide (a) a payoff letter to the Secured Lender, the Chapter 11 Trustee and the U.S. Trustee within

ten (10) Business Days of the date hereof, and (b) updated payoff letters to the Secured Lender, the Chapter 11 Trustee or the Plan Administrator, as applicable, and the U.S. Trustee no later than ten (10) Business Days prior to the Confirmation Hearing and the Closing Date, respectively. Any undisputed amounts included in the payoff letters will be deemed Allowed Secured Claims. If the parties are unable to amicably resolve any disputed amounts included in the payoff letters, the disputed amounts will be determined by the Bankruptcy Court with the undisputed portion being Allowed and paid in accordance with the terms hereof.

5.2 On or as soon as reasonably practicable after the Closing Date of the Sale of the Co-op Interests, the Disbursing Agent shall pay one hundred percent (100%) of the Class 1 Claim to the holder of the Class 1 Claim from the proceeds of the Sale of the Co-op Interests; *provided, however*, that if no Sale of the Co-op Interests is consummated pursuant to the Plan, and the Secured Lender exercises its right to credit bid all or a portion of its Allowed Secured Lender Secured Claim for the Co-op Interests pursuant to section 363(k) of the Bankruptcy Code, the Secured Lender shall, as a condition to the consummation of such credit bid and the transfer of the Co-op Interests to Secured Lender (or its designee), pay or cause to be paid in full, in cash, the Allowed amount of the Class 1 Claim to 40 TCC, on or as soon as reasonably practicable after the Closing Date of the credit bid transaction.

5.3 *Class 2 Claim*. The Class 2 Claim shall be Allowed in the amount of $366,308.50 as of the Filing Date. On or as soon as reasonably practicable after the Effective Date, the Plan Administrator, for and on behalf of the Debtor, shall execute a quitclaim deed transferring all of the Debtor's right, title, and interest in and to the Maplewood Property, free and clear of all Liens, Claims, encumbrances, and interests other than Maplewood Lender's Lien, in full and final satisfaction, settlement, release, and discharge of Maplewood Lender's Allowed Secured Claim.

Upon delivery of the quitclaim deed, Maplewood Lender's Lien on the Property shall be deemed fully satisfied and released. Maplewood Lender shall be responsible for all Transfer Taxes, recording fees, and similar costs associated with the transfer, to the extent applicable. To the extent that Maplewood Lender's total Allowed Claim in the amount of $366,308.50 exceeds the value of the Maplewood Property, as determined by the Court if in dispute, such deficiency shall constitute a General Unsecured Claim and shall receive the treatment provided for in Class 5 of the Plan.

5.4 *Class 3 Claim*. The Class 3 Claim shall be Allowed in the amount of $23,588,494.02 as of the Filing Date plus all fees and expenses pursuant to the Secured Lender Loan Documents, including without limitation reasonable attorneys' fees and expenses, special servicing fees and liquidation and/or workout fees incurred by the Secured Lender subsequent to the Filing Date, plus, to the extent that the value of the Sale Assets exceeds the amount of the Class 3 Claim, post-Filing Date interest at the default rate set forth in the Secured Lender Loan Documents.

(a) On the Effective Date, the Secured Lender shall be authorized to set off any funds in the Secured Lender Reserves and apply such funds towards the amount of the Class 3 Claim.

(b) On the Closing Date for each Sale of a Property, the Plan Administrator shall pay to the holder of the Class 3 Claim the proceeds from the Sale(s), if any, remaining after funding: (i) the Chapter 11 Trustee Fee Secured Lender Plan Contribution for the period from June 1, 2026, through the Effective Date, (ii) such amount as may be necessary to pay the Post-Effective Date Plan Administrator Sale and Coffee Shop Fees, (iii) the Allowed Priority Tax Claim Carve Out, (iv) outstanding post-confirmation U.S. Trustee Fees, and (v) Con Edison Administrative Claim for the respective Property. If and to the extent it is determined that any portion of such

reserved funds are not required to be paid to any such claimants, such funds will be paid to the Secured Lender as soon as reasonably practicable following any such determination.

(c) The Plan Administrator shall pay any insurance proceeds refund, if any, relating to any casualty concerning any Real Property to the holder of the Class 3 Claim within three (3) Business Days after receiving such funds.

(d) The Plan Administrator shall execute such instruments or documents reasonably requested by the holder of the Class 3 Claim to evidence such transfer.

(e) The distribution to the Secured Lender shall not exceed one hundred percent (100%) of its Allowed Secured Lender Secured Claim.

(f) If the Secured Lender is the Purchaser of any Property or Properties at any Sale(s) pursuant to section 363(k) of the Bankruptcy Code, then the Class 3 Claim shall be deemed paid to the extent of the amount of Cash Collateral paid to the Secured Lender, the Secured Lender's set-off of the Secured Lender Reserves, if any, plus the amount of credit bid made by the Secured Lender.

(g) To the extent that there are insufficient proceeds from all of the foregoing to pay the Class 3 Claim in full, the unpaid portion of the Class 3 Claim shall be treated as an Allowed General Unsecured Claim in Class 5 of the Plan. The Secured Lender has waived its right to any distribution under the Plan on account of any Class 5 Claim it may hold, conditioned upon, and subject to, the Effective Date occurring.

(h) The Secured Lender shall retain its duly perfected and first priority mortgage and security interests and Liens in all of the Debtor's assets, including without limitation the Properties, the Personal Property, accounts receivable, and any Cash Collateral until each Sale's respective Closing Date, other than in the Co-op Interests, in which the Secured Lender

holds a second priority Lien and security interest, junior only to 40 TCC. Effective as of each Closing Date, the mortgage, security interests and Liens of the Class 3 Allowed Secured Lender Secured Claim shall be transferred automatically to the proceeds of such Sale in the same order of priority and without any need for the holder of the Class 3 Allowed Secured Lender Secured Claim to take any act of perfection.

5.5 *Class 4 Claims*.

(a) The SBA. The SBA has asserted a Secured Claim in the amount of $168,474.55, secured by Liens on the Personal Property (*not* the Real Property) that is also the same collateral securing the Secured Lender Secured Claim. The SBA's Liens are later recorded than, and junior in priority to, the Secured Lender's Liens on the SBA's collateral. Thus, the SBA Claim is wholly unsecured within the meaning of section 506(a) of the Bankruptcy Code because the value of the Secured Lender's collateral does not exceed the Allowed amount of the Secured Lender Secured Claim, and the Secured Lender holds Liens on all of the Debtor's Properties and Personal Property that were recorded prior to and are senior to the SBA's Liens on any such property. Accordingly, the SBA Claim will be treated as a General Unsecured Claim in Class 5 and shall receive the treatment provided for General Unsecured Claims hereunder.

However, in the event the SBA is determined by the Bankruptcy Court to hold an Allowed Secured Claim, the SBA shall receive on account of such Allowed Secured Claim, except to the extent that the SBA agrees to less favorable treatment therefor, cash equal to the amount of such Allowed Secured Claim from the proceeds of Sale of the collateral securing the SBA Claim, on or as soon as reasonably practicable after the Closing Date of such Sale.

(b) 211 TOC. 211 TOC shall have an Allowed Secured Claim in the amount of any security deposit in 211 TOC's possession that serves as security for such Claim (asserted

to be in the amount of $70,272.74 as of the Filing Date). On the Effective Date, 211 TOC is authorized and permitted to apply and/or offset any such unapplied security deposit against the 211 TOC Pre-Petition Claim in full satisfaction of such Allowed Secured Claim. The balance of the 211 TOC Pre-Petition Claim shall be treated as a General Unsecured Claim in Class 5 of the Plan. For the avoidance of doubt, the treatment and allowance of the 211 TOC Pre-Petition Claim is separate and apart from the treatment and allowance of the Administrative Claim filed by 211 TOC in the Chapter 11 Case on April 9, 2025, which claim was assigned Claim No. 29 and is filed in the amount of $135,192.88. Any Allowed Administrative Claim of 211 TOC will be treated in accordance with section 2.2 as an Allowed Supporting Party Administrative Claim.

(c) 245 E 19 Realty. 245 E 19 Realty shall have an Allowed Secured Claim in the amount of any security deposit in 245 E 19 Realty's possession that serves as security for such Claim (asserted to be in the amount of $149,882.63 as of the Filing Date). On the Effective Date, 245 E 19 Realty is authorized and permitted to apply and/or offset any such unapplied security deposit against the 245 E 19 Realty Pre-Petition Claim, in full satisfaction of such Allowed Secured Claim. The balance of the 245 E 19 Realty Pre-Petition Claim shall be treated as a General Unsecured Claim in Class 5 of the Plan. For the avoidance of doubt, the treatment and allowance of the 245 E 19 Realty Pre-Petition Claim is separate and apart from the treatment and allowance of any Administrative Claim asserted by 245 E 19 Realty in the *Motion of 245 E. 19 Realty LLC for Allowance of Chapter 11 Administrative Expense Claim* filed on May 1, 2026 (Docket No. 243) in the Chapter 11 Case. Any Allowed Administrative Claim of 245 E 19 Realty will be treated in accordance with section 2.2 as an Allowed Supporting Party Administrative Claim.

(d) Lion's Head Condo, Union Lane House Condo, 12 E 13 Condo and 105-07 E 16 Condo.

*(i) Lien's Arising through the Effective Date*

The Liens asserted by Lion's Head Condo, Union Lane House Condo and 12 E 13 Condo (and not 105-07 E 16 Condo which did not file a secured claim) are junior in priority to the Secured Lender's Liens on the Real Property alleged to be securing such asserted Secured Claims. Thus, the Secured Claims asserted by Lion's Head Condo, Union Lane House Condo and 12 E 13 Condo are wholly unsecured within the meaning of section 506(a) of the Bankruptcy Code because the value of the Secured Lender's collateral does not exceed the Allowed amount of the Secured Lender Secured Claim, and the Secured Lender holds Liens on all of the Debtor's Properties that were recorded prior to and are senior to the asserted Liens of such claimants. Accordingly, the Lion's Head Condo Pre-Petition Claim, the Union Lane House Condo Pre-Petition Claim and the 12 E 13 Condo Pre-Petition Claim will be treated as General Unsecured Claims in Class 5 and shall receive the treatment provided for General Unsecured Claims hereunder.

However, if and to the extent Lion's Head Condo, Union Lane House Condo and/or 12 E 13 Condo are determined to hold Allowed Secured Claims, on or as soon as practicable after the Closing of the Sale of the Real Property securing the Allowed Secured Claim asserted in (A) the Lion's Head Condo Pre-Petition Claim (*i.e.*, the 121 W 19), (B) the Union Lane House Condo Pre-Petition Claim (*i.e.*, the 116-118 W 14), and (C) the 12 E 13 Condo Pre-Petition Claim (*i.e.*, the 12 E 13), respectively, each such holder of an Allowed Other Secured Claim shall receive on account of such Claim, except to the extent that any such holder of an Allowed Other Secured Claim agrees to less favorable treatment therefor, cash equal to the amount of such Allowed Other Secured Claim. The balances of the Lion's Head Condo Pre-Petition Claim, the Union Lane House Condo Pre-Petition Claim, and the 12 E 13 Condo Pre-Petition Claim, shall be treated as General Unsecured Claims in Class 5 of the Plan.

For the avoidance of doubt, the treatment and allowance of the Lion's Head Condo Pre-Petition Claim, the Union Lane House Condo Pre-Petition Claim, and the 12 E 13 Condo Pre-Petition Claim are separate and apart from the treatment of any Administrative Claims filed by Lion's Head Condo (Claim No. 87), Union Lane House Condo (Claim No. 30), and 12 E 13 Condo (Claim No. 31), respectively, in the Chapter 11 Case. Any Allowed Administrative Claims of such Claimants will be treated in accordance with section 2.2 as an Allowed Supporting Party Administrative Claim.

*(ii) Liens Arising After the Effective Date Through the Closing*

Any Liens asserted by Lion's Head Condo, Union Lane House Condo, 12 E 13 Condo and/or 105-07 E 16 Condo on account of common charges, assessments or other amounts accruing from and after the Effective Date through the Closing of the Sale of the applicable Real Property are junior and subordinate in priority to the Secured Lender's Liens on such Real Property. Any Secured Claims on account of such amounts are hereby waived, and such holders shall not be entitled to payment of any such amounts from the Sale Proceeds of such Real Property.

5.6 Class 5 Claims. The Plan Administrator shall pay each holder of an Allowed General Unsecured Claim in Class 5 its Pro Rata Share of the General Unsecured Claim Secured Lender Plan Contribution on or as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the date on which such Claim becomes an Allowed Claim.

In addition, if and to the extent there is any cash remaining from the Sales of the Properties, Net Avoidance Action Recoveries or proceeds of any Litigation Claims remaining after payment in full to the Plan Administrator and the fees and expenses associated with the prosecution of Litigation Claims, after satisfaction in full of all Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Claims in Classes 1, 2, 3, and 4, and unless otherwise agreed to

by the holder of an Allowed General Unsecured Claim in Class 5, the Plan Administrator shall pay to each holder of an Allowed General Unsecured Claim in Class 5 its Pro Rata Share of any such available cash (not to exceed the amount of its Allowed Claim) on or as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the date on which such Claim becomes an Allowed Claim.

5.7 Subject to confirmation of the Plan and the occurrence of the Effective Date, the Secured Lender agrees to forego any right to any distribution under the Plan on account of any Class 5 Claim it may hold.

5.8 Class 6 Interests. The Plan Administrator shall pay the following to the holders of Class 6 Interests pursuant to the allocation set forth in the Debtor's governing documents, if any: (a) any proceeds remaining from the Sale(s) of the Sale Assets after the payments made pursuant to all other sections of the Plan; (b) all proceeds from any insurance proceeds relating to any casualty at any Real Property and the proceeds of the Litigation Claims remaining after the payment of the Class 1 Allowed Claim and the Class 3 Allowed Claim in full; and (c) any funds remaining in the Reserves after the payment of all claims out of the Reserves as provided in the Plan and the payment in full of Allowed Claims in Classes 1, 2, 3, 4, and 5. The Interests in the Debtor, if any, shall also be cancelled on the Effective Date unless Class 5 Claims are paid in full.

5.9 Acceptance by an Impaired Class of Claims. Consistent with section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired class of Claims shall have accepted the Plan if the Plan is accepted by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such class that have timely and properly voted to accept or reject the Plan.

5.10 Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ("Cram Down"). If any Class of Claims or Interests entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Secured Lender reserves the right to amend the Plan in accordance with section 10.2 of the Plan or undertake to have the Bankruptcy Court "cram down" any such Class and confirm the Plan under section 1129(b) of the Bankruptcy Code, or both. With respect to Impaired Classes of Claims or Interests that are deemed to reject the Plan, including the Class 6 Interests, the Secured Lender shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

## ARTICLE VI
## Provisions as to Disputed Claims and Distributions

6.1 *Disputed Claims.* In connection with cash distributions to be made in respect of Allowed Claims, there shall be reserved from any distribution to the holder of a Disputed Claim the amount of cash which then otherwise would be paid in respect to such Disputed Claim if the full amount of such Claim were deemed to be an Allowed Claim or such lesser amount as the Bankruptcy Court may determine. Upon such Claim becoming an Allowed Claim, any distribution then due to be made in respect of such claim shall be paid no later than ten (10) Business Days thereafter in accordance with the provisions hereof and of such order of the Bankruptcy Court. Any monies remaining on deposit with respect to any Disputed Claim after its resolution or determination by the Bankruptcy Court shall be returned to the Plan Administrator and distributed to creditors and Interest holders in their order of priority under the Bankruptcy Code. For purposes of clarity, if only a portion of a Claim is disputed, only the distribution with respect to the disputed portion of the Claim shall be reserved from distribution. The undisputed portion of such claim shall be paid as an Allowed Claim under the Plan.

6.2 All objections to Claims (other than Administrative Claims and Professional Claims) shall be filed with the Bankruptcy Court by the later of: (a) ninety (90) days after the Effective Date, or the first Business Day thereafter if the 90th day falls on a day which is not a Business Day; or (b) with respect to a Claim arising from the rejection of an executory contract or unexpired lease, if any (a "Rejection Claim"), thirty (30) days after the filing of a proof of claim for the Rejection Claim with the Bankruptcy Court, or the first Business Day thereafter if the 30th day falls on a day which is not a Business Day.

6.3 Nothing in the Plan shall prohibit the Plan Administrator or Secured Lender from filing a motion to estimate any Claim for distribution purposes under section 502 of the Bankruptcy Code.

6.4 *Disputed Claims Reserves*

(a) The Plan provides for two separate Disputed Claims reserves. First, the Plan Administrator shall establish the Supporting Party Disputed Claims Reserve from the Administrative Claim Supporting Party Secured Lender Plan Contribution on the Effective Date, or as soon thereafter as is reasonably practicable, for the purpose of holding distributions allocable to disputed Supporting Party Administrative Claims. The Supporting Party Disputed Claims Reserve shall hold the Pro Rata Share of the Administrative Claim Supporting Party Secured Lender Plan Contribution allocable to each disputed Supporting Party Administrative Claim as if such Disputed Claim were an Allowed Supporting Party Administrative Claim in the amount of such Claim as filed or in such amount as estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code.

(b) Second, the Plan Administrator shall establish the General Unsecured Disputed Claims Reserve from the General Unsecured Claim Secured Lender Plan Contribution

on the Effective Date, or as soon thereafter as is reasonably practicable, for the purpose of holding distributions allocable to Disputed Claims that are General Unsecured Claims. The General Unsecured Disputed Claims Reserve shall hold the Pro Rata Share of the Unsecured Claims Reserve allocable to each such Disputed Claim as if such Disputed Claim were an Allowed General Unsecured Claim in the amount of such Claim as filed or in such amount as estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code.

(c) Disputed Claims that become Allowed Supporting Party Administrative Claims, in whole or in part, shall be satisfied exclusively out of the Supporting Party Disputed Claims Reserve. The holder of any such Disputed Claim shall receive the amount such holder would have received in accordance with the provisions of the Plan and Plan Support Agreement as if such holder's Supporting Party Administrative Claim had been an Allowed Supporting Party Administrative Claim as of the Effective Date.

(d) Disputed Claims that become Allowed General Unsecured Claims in whole or in part, shall be satisfied exclusively out of the General Unsecured Disputed Claims Reserve. The holder of any such Disputed Claim shall receive the amount such holder would have received in accordance with the provisions of the Plan as if such holder's General Unsecured Claim had been an Allowed General Unsecured Claim as of the initial date on which distributions were made to holders of Allowed General Unsecured Claims.

(e) In the event the funds remaining in either the Supporting Party Disputed Claims Reserve or the General Unsecured Disputed Claims Reserve shall be insufficient to satisfy all Disputed Claims that have become Allowed Claims and are due to be satisfied with distributions from such reserve, such Disputed Claims shall be satisfied on a Pro Rata basis from the applicable

reserve. After all funds have been distributed from a reserve, no further distributions shall be made in respect of Disputed Claims from such reserve.

(f) If a Disputed Claim, the amount of which is held in either the Supporting Party Disputed Claims Reserve or the General Unsecured Disputed Claims Reserve, is disallowed, in whole or in part, then unless the Plan Administrator determines otherwise, there shall be released from the applicable reserve funds in the amount of the distribution previously reserved in respect of such Disputed Claim since the Effective Date, which funds shall then be unreserved and unrestricted, and shall be available for distribution to the holders of Allowed Claims in the applicable Class in accordance with the terms of the Plan, as determined by the Plan Administrator.

(g) If the Plan Administrator at any time determines that it is not necessary to hold in either the Supporting Party Disputed Claims Reserve or the General Unsecured Disputed Claims Reserve all of the funds contained therein in order to satisfy all remaining Disputed Claims asserted which, if Allowed, would be payable from that reserve, the Plan Administrator may, but shall not be required to, release from the applicable reserve for distribution to holders of Allowed Claims some or all of the funds previously deposited therein. At such time as all Disputed Claims subject to payment from a reserve have been resolved, any remaining funds in the applicable reserve shall be released from such reserve for distribution to holders of Allowed Claims in accordance with the terms of the Plan.

## ARTICLE VII
## Means for Execution of the Plan

7.1 *Means for Implementation*. The means for implementation of the Plan consist of: (a) the appointment of the Plan Administrator to continue to market and solicit offers to purchase the Properties, to execute all documents in connection with the Sale(s), to pursue Avoidance Actions and/or Litigation Claims in his discretion, and to continue prosecuting the adversary

proceeding against the Coffee Shop Occupant; (b) the funding of the Administrative Claim Supporting Party Secured Lender Plan Contribution by the Secured Lender to ensure distributions to holders of Allowed Supporting Party Administrative Claims; (c) the Sale(s) of the Real Property and the Personal Property (collectively, the "Sale Assets") and the use of the proceeds from the Sale(s) to make distributions to creditors under the Plan; (d) the use of Secured Lender Plan Contributions to make distributions to creditors to the extent provided under the Plan; (e) the set-off of any Secured Lender Reserves by the Secured Lender; (f) the funding of the General Unsecured Claim Secured Lender Plan Contribution to ensure distributions to holders of Class 5 Claims; (g) the Secured Lender's funding of amounts necessary for implementation of the Plan in the event the Secured Lender is the Purchaser of any Sale Assets pursuant to a credit bid under section 363(k) of the Bankruptcy Code; and (h) distribution of the proceeds of the Avoidance Actions and/or Litigation Claims in accordance with the terms of the Plan.

7.2 *Post-Confirmation Management of the Debtor and its Properties*. Upon the Effective Date, the Debtor's manager, members, officers and directors, including without limitation the Rabbi, shall be conclusively deemed to have resigned and the Plan Administrator shall take over exclusive management and control of the Debtor. The Plan Administrator's rights and obligations shall be governed pursuant to the terms of the Plan, the Confirmation Order and the Plan Administrator Agreement. Within two (2) Business Days after the Effective Date, the Chapter 11 Trustee and the Debtor's existing manager, members, officers and directors, including without limitation the Rabbi, shall turn over all books and records of the Debtor, including electronic records and emails to the Plan Administrator, including any passwords associated therewith. Upon the Effective Date, the Plan Administrator shall be exclusively authorized to take all actions and execute all documents and instruments on behalf of the Debtor including without limitation: (a) the

retention of the Broker; (b) the retention of special counsel for the purpose of closing the Sales of the Sale Assets and prosecuting any Avoidance Actions or Litigation Claims, including the continued prosecution of the adversary proceeding against the Coffee Shop Occupant and any eviction proceeding against any tenant, occupant or licensee at a Property; (c) to implement or enforce the provisions of the Plan and Confirmation Order; (d) to prepare and file any outstanding monthly operating reports and/or quarterly reports required by the Bankruptcy Code, Bankruptcy Rules and U.S. Trustee's guidelines, and (e) to review and object to any claims as the Plan Administrator deems necessary or appropriate. The Plan Administrator shall also act as the Disbursing Agent for all payments under the Plan. The post-Effective Date Debtor shall continue to maintain insurance on each of the Sale Assets until title to the respective Sale Asset is transferred pursuant to the terms of the Plan, with the Plan Administrator and the U.S. Trustee listed as additional insureds or notification parties under such insurance policies. The Secured Lender agrees to continue to fund the costs of maintaining the insurance on each of the Sale Assets during such period.

7.3 *The Sale*. (a) Confirmation Sale Properties. The sales of the Confirmation Sale Properties shall be approved pursuant to the Confirmation Order.

(b) Post-Confirmation Sale Properties. To the extent there are successful bidders pursuant to the terms of the Bidding Procedures for any of the following Properties: (i) 121 W 19, (ii) 116-118 W 14, or (iii) the Co-op Interests as of the date of the Confirmation Hearing, the sales of such Properties to such successful bidders may be approved pursuant to the Confirmation Order. To the extent there are no successful bidders for any such Properties as of the date of the Confirmation Hearing, the Plan provides for continued marketing and sale of such Post-Confirmation Sale Properties following confirmation of the Plan pursuant to the Bidding

Procedures. The Sale of any of the Properties after the Effective Date will be a Sale pursuant to the Plan, the Confirmation Order and, to the extent there is not a Purchaser for such Property as of the Effective Date, pursuant to further order of the Bankruptcy Court.

(c) *Marketing of Post-Confirmation Sale Properties*. Upon entry of the Confirmation Order, the Broker shall continue to market the Post-Confirmation Sale Properties for sale in accordance with the terms of the Bidding Procedures. It shall be the Broker's duty to seek to obtain the highest and best price for the Post-Confirmation Sale Properties, taking into account the ability of proposed purchasers to close on their offers to purchase such Properties. The Broker shall timely communicate all relevant information concerning the Sale process, including all offers made for the Post-Confirmation Sale Properties, to the Plan Administrator and the Secured Lender. To the extent there are successful bidders or Purchasers for any Post-Confirmation Sale Properties that have not been identified and approved as of the Effective Date, such proposed Sale(s) shall be subject to approval by the Bankruptcy Court, which approval the Plan Administrator shall seek by filing (i) a notice of the Successful Bidder pursuant to the Bidding Procedures, and (ii) a notice of sale hearing setting forth a hearing date and deadline for objections to such proposed Sale(s).

7.4 *Purchase and Sale Agreement*. The Plan Administrator, on behalf of the Debtor, shall have the authority to enter into one or more asset purchase agreements (each, an "APA") with a proposed purchaser (each, a "Purchaser") pursuant to the terms of the Bidding Procedures.

7.5 *The Closing Date*. The Sale(s) of any Sale Assets shall close no later than twenty-one (21) days after the later of (i) the Effective Date and (ii) with respect to any Sale Assets the Sale of which is not approved pursuant to the Confirmation Order, the date of entry of an order of the Bankruptcy Court approving such Sale (the "Closing Date") unless an extension of the Closing Date is agreed to in writing by the Secured Lender or as otherwise permitted under the APA. The

Purchaser's and the Chapter 11 Trustee's or Plan Administrator's, as applicable, respective obligations to close any Sale(s) shall be conditioned on receipt of the AG Approval, an order of the Bankruptcy Court providing the equivalent approval under the Religious Corporations Law and the Not-for-Profit Corporation Law of the State of New York, or a determination by the Bankruptcy Court that such approval is not required or has been preempted by applicable provisions of the Bankruptcy Code.

7.6 *Free and Clear Sale*. The Sale Assets shall be sold free and clear of all liens, claims, encumbrances and interests pursuant to Bankruptcy Code section 363(f), which liens, claims, encumbrances and interests shall upon each Closing Date attach to the proceeds of each Sale in the same order of priority that currently exist on such Sale Assets.

7.7 *Cancellation of Liens*. Except as otherwise specifically provided herein, upon the payment in full in cash of a Secured Claim, any Lien securing such Secured Claim, shall be deemed released, and the holder of such Secured Claim shall be directed to release any collateral or other property of the Debtor held by such holder and to take such actions as may be requested by the Plan Administrator to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Plan Administrator on behalf of the Debtor.

7.8 *"As Is Where Is"*. The Sale of any Sale Assets as contemplated by the Plan shall be without representation or warranties of any kind, nature or description by the Debtor, Chapter 11 Trustee or Plan Administrator. The Sale Assets shall be sold or transferred "as is," "where is" and "with all faults." ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE IS EXPRESSLY DISCLAIMED AND THERE SHALL BE NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE OR CONDITION OF THE SALE ASSETS OR ANY PORTION THEREOF. Any Purchaser of any

Sale Assets will be deemed to acknowledge and represent that it: (a) has had an opportunity to conduct due diligence regarding the Sale Assets prior to making its offer; (b) has relied solely upon its own independent review, investigation, and inspection of any documents and/or the Sale Assets in making its bid; and (c) did not rely upon or receive any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the Sale Assets, or the completeness of any information provided in connection with the Sale or the Auction.

7.9 *Funding of Reserves*.

(a) On the Effective Date, the Plan Administrator shall reserve from the Secured Lender Plan Contribution such funds as are necessary to: (i) fund the aggregate cash payment of Three Hundred Forty-Seven Thousand, Six Hundred Thirty-One Dollars ($347,631.00) for distribution of (A) Three Hundred Twenty-Five Thousand Dollars ($325,000.00) to the Chapter 11 Trustee and the Chapter 11 Trustee's Counsel, *plus* (B) Twenty-Two Thousand, Six Hundred Thirty-One Dollars ($22,631.00) to the Chapter 11 Trustee's Financial Advisor, in full and final satisfaction of the Chapter 11 Trustee's Professionals' Allowed Administrative Claims for the period from the Filing Date through May 31, 2026; (ii) fund Sixty-Five Thousand Dollars ($65,000.00) on account of estimated U.S. Trustee Fees accruing through the Effective Date and U.S. Trustee Fees arising from the Sales of the Confirmation Sale Properties; and (iii) fund the Unsecured Claims Reserve in the amount of Ten Thousand Dollars ($10,000.00).

(b) The Plan Administrator shall also reserve from proceeds of Sales of the Sale Assets, additional funds as are necessary and agreed to with the Secured Lender to fund reserves for any additional U.S. Trustee Fees, Priority Tax Claims, Priority Claims, Allowed Administrative

Claims of the Chapter 11 Trustee otherwise payable from the Chapter 11 Trustee Fee Secured Lender Plan Contribution, and any other reserves required hereunder.

7.10 *Return of Excess Reserve Funds*. The Plan Administrator shall pay to the holder of the Class 3 Claim all funds remaining in the Reserves after the payment of all distributions under the Plan unless and until the Secured Lender's Allowed Secured Lender Secured Claim is paid in full. Any funds then remaining in the Reserves after the payment of the Class 3 Claim in full shall be paid to holders of Class 5 Allowed General Unsecured Claims until they are paid in full and then to holders of Class 6 Interests.

7.11 *Plan Administrator Compensation*. The Plan Administrator shall be paid $850.00 per hour for his services and shall be entitled to reimbursement of reasonable and documented expenses from the Confirmation Date through the date the Chapter 11 Case is closed. With respect to each Sale of a Property occurring after the Confirmation Date, the fees and expenses of the Plan Administrator and his professionals incurred in connection with such Sale shall be paid from the proceeds of such Sale. The Plan Administrator shall be authorized to retain counsel for purposes of effectuating Substantial Consummation of the Plan, including efforts to sell and close on the Sale(s), claims review and objections, the continued prosecution of the adversary proceeding against the Coffee Shop Occupant, and the analysis and prosecution of any Avoidance Actions and/or Litigation Claims. The fees and expenses of the Plan Administrator and his professionals shall be paid first from the Sale Proceeds and then from the proceeds of any Litigation Claims; *provided, however*, that the fees and expenses of the Plan Administrator and his professionals shall not be paid from the Sale Proceeds or any Cash Collateral to the extent they relate to the assertion of Litigation Claims, unless the Secured Lender has agreed in writing to a carve-out from the Sale Proceeds or any Cash Collateral or any other collateral held by the Secured Lender. Post-

confirmation compensation and reimbursement of expenses pursuant to this section of the Plan shall be paid to the Plan Administrator and his professionals following the submission of monthly invoices by email to the Plan Administrator and the Secured Lender through the closing on the Sale of the last of the Properties, which invoices shall contain time entries in one-tenth hour increments and contain descriptions of the services rendered in a manner which complies with the requirements of the Bankruptcy Code, Bankruptcy Rules and guidelines of the U.S. Trustee. If no objection to an invoice is received by the Plan Administrator within fourteen (14) days of submission of such invoice, then the Plan Administrator may pay such invoice from the Sale Proceeds, Cash Collateral, or Avoidance Action recoveries, as applicable pursuant to the terms of this Plan. If an objection to such invoice is served on the Plan Administrator within such fourteen (14) day period, then the Plan Administrator shall file a motion with the Bankruptcy Court requesting payment of such invoice, and the Plan Administrator shall not pay such invoice unless, until and to the extent it is approved by the Bankruptcy Court.

7.12 *Effectuating Documents; Further Transactions*. Upon the Confirmation Date, all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) shall be deemed authorized and approved in all respects, in each case, in accordance with and subject to the terms hereof. On or as soon as practicable after the Confirmation Date, the Plan Administrator may take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate, the Plan, including without limitation: (a) the execution and delivery of appropriate agreements or other documents on behalf of the Debtor containing terms that are consistent with the terms of the Plan; (b) the execution and delivery on behalf of the Debtor of appropriate instruments of transfer, assignment, assumption, or delegation of any Sale Assets, property, right, liability, debt, or obligation on terms consistent with the terms

of the Plan and having other terms to which the applicable parties agree; and (c) all other actions that the Plan Administrator determines to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

7.13 *Closing of Chapter 11 Case.* After the Plan has been substantially consummated, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**ARTICLE VIII**
**Litigation Claims**

8.1 All claims and causes of action held by the Debtor or its Estate, including all claims under contract, tort, state law or chapter 5 or any other provision of the Bankruptcy Code, including all Avoidance Actions (the "Litigation Claims") shall be preserved and retained following the Confirmation Date, and shall survive confirmation of the Plan. The Plan Administrator, in his discretion, shall have the authority to commence, prosecute, settle or abandon any or all such claims. Any fees and expenses incurred by the Plan Administrator and his retained professionals associated with determining whether to pursue, with investigating, or with pursuing any Litigation Claims shall be paid from the proceeds obtained through the Avoidance Action recoveries.

**ARTICLE IX**
**Unexpired Leases and Executory Contracts**

9.1 Upon the Confirmation Date, the Plan Administrator shall be exclusively authorized to take any and all action as may be or become necessary or appropriate to terminate any purported lease, including the commencement of any eviction or other action to evict or remove any purported tenant, occupant or licensee at any Real Property, including without limitation the Coffee Shop Occupant.

9.2 All executory contracts and unexpired leases of the Debtor shall be deemed rejected as of the Effective Date, unless a particular executory contract or unexpired lease (i) has previously

been assumed or rejected pursuant to order of the Bankruptcy Court or applicable provisions of the Bankruptcy Code, or (ii) has expired or otherwise terminated pursuant to its terms.

9.3 Any Entity whose Claim arises from rejection of an executory contract or unexpired lease shall, to the extent such Rejection Claim becomes an Allowed Claim, have the rights of the holder of a Class 5 Claim.

9.4 Any Entity who has a Rejection Claim against the Debtor may file a proof of claim with the clerk of the Bankruptcy Court and serve such proof of claim upon the Plan Administrator and the Secured Lender, within twenty-one (21) days following service upon such Entity of notice of entry of the Confirmation Order or an order of the Bankruptcy Court authorizing the rejection of the Entity's executory contract or unexpired lease, whichever is later. If such Rejection Claim is not filed within such specified time, it shall forever be barred from assertion against the Debtor's Estate. Notwithstanding anything to the contrary contained in the Plan, the Plan Administrator shall have thirty (30) days after the filing of such Rejection Claim to file an objection thereto.

## ARTICLE X
## Effective Date; Substantial Consummation; Right to Modify Plan

10.1 *The Effective Date*. The following shall be conditions precedent to the Effective Date of the Plan:

(a) Entry of the Confirmation Order;

(b) The Plan Administrator shall have been appointed, whether through confirmation of the Plan or otherwise;

(c) All required Secured Lender Plan Contributions shall have been funded so that the Plan Administrator shall have sufficient cash on hand to pay all Administrative Claims in full or as otherwise agreed to pursuant to the terms of the Plan;

(d) The Chapter 11 Trustee and the Chapter 11 Trustee's Counsel shall have accepted the Chapter 11 Trustee Fee Secured Lender Plan Contribution in full settlement and satisfaction of their Allowed Administrative Claims accrued through May 31, 2026; and

(e) All other documents and agreements necessary to implement the Plan shall have been executed and delivered.

10.2 *Secured Lender's Right to Modify Plan*. The Secured Lender reserves the right to modify the Plan prior to the Confirmation Date and it thereafter may modify the Plan in accordance with section 1127(b) of the Bankruptcy Code, provided that such modifications are set forth in a writing signed by both the Plan Administrator on behalf of the Debtor and the Secured Lender, and are filed with the Bankruptcy Court on notice to creditors, equity holders of the Debtor, if any, and all parties who have filed notices of appearance in the Chapter 11 Case.

10.3 *Substantial Consummation*. Substantial Consummation shall occur upon the Closing of the Sales of two (2) or more of the Properties pursuant to the Plan.

## ARTICLE XI
## Transfer Tax Exemption

11.1 The Sale(s) of the Sale Assets pursuant to the Plan, including without limitation the Real Property, shall be exempt from New York State and New York City Transfer Taxes and stamp taxes pursuant to section 1146 of the Bankruptcy Code.

11.2 Each Sale of any Property and/or other Sale Assets pursuant to an APA, a Sale Order, and the Plan constitutes a sale pursuant to a plan within the meaning of section 1146(a) of the Bankruptcy Code. The transfer of Sale Assets to each Purchaser (or its permitted assignee) shall be free and clear of any and all stamp tax, Transfer Tax or similar tax imposed by any state or local law, including without limitation New York State and New York City real property Transfer Taxes. Any deed or conveyance or other document required to be delivered in connection with the transfer

of any Sale Assets pursuant to the Plan and a Sale Order shall be recorded or filed, as appropriate, in the land records for the County of New York and/or State of New York without the payment of any such taxes. All filing and/or recording offices and any Entity with authority over the foregoing, including without limitation the New York City Register, shall comply with section 1146(a) of the Bankruptcy Code and shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation such documents without the payment of any such tax or governmental assessment.

11.3 To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto, including without limitation, the Real Property, the Maplewood Property, or the issuance, transfer or exchange of any security under the Plan shall not be subject to any Transfer Taxes, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

11.4 Pursuant to section 1146(a) of the Bankruptcy Code, all filing and/or recording offices and any Entity with authority over the foregoing, including without limitation the New York City Register, shall accept a certified copy of the applicable Sale Order and the Confirmation Order for filing and recordation and index such orders in connection with the Purchaser without the payment of any tax or governmental assessment.

## ARTICLE XII
## Distributions

12.1 The Plan Administrator shall act as Disbursing Agent under the Plan and shall make all distributions under the Plan to the U.S. Trustee, appropriate holders of Allowed Supporting Party

Administrative Claims, Allowed Professional Claims, Allowed Claims and Interests in accordance with the terms of the Plan.

12.2 Checks issued by the Disbursing Agent on account of the Con Edison Administrative Claim, Allowed Supporting Party Administrative Claims, Allowed Professional Claims and Allowed Claims shall be null and void if not negotiated within one hundred twenty (120) days after the date of issuance thereof. The amount represented by such voided check shall be deemed undeliverable property and shall be paid by the Plan Administrator to the Secured Lender, provided the Class 3 Claim has not been paid in full under the Plan, and if the Class 3 Claim has been paid in full, such amounts shall be distributed in order of priority under the Bankruptcy Code.

12.3 The Debtor through the Plan Administrator may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and causes of action of any nature whatsoever that the Debtor may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided, however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, or its successor, of any claims, rights, or causes of action it may possess against the holder of such Claim.

## ARTICLE XIII
## EFFECT OF CONFIRMATION; VESTING OF PROPERTY; SETTLEMENT, INJUNCTION, RELEASE AND RELATED PROVISIONS

13.1 On the Effective Date, the terms of the Plan shall be immediately effective and enforceable and shall bind all holders of all Claims against or Interests in the Debtor, whether or not such holders accept the Plan.

13.2 *No Discharge*. Pursuant to section 1141(d)(3) of the Bankruptcy Code, neither the Plan nor confirmation of the Plan shall discharge any Claim against the Debtor or any of its Related Persons, and nothing herein or in the Confirmation Order shall or shall be deemed to discharge,

release or exculpate the Debtor or any of its Related Persons from any Claims, all of which Claims shall survive the confirmation and effectiveness of the Plan.

13.3 *Settlement*. In accordance with and subject to the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Plan Administrator may compromise and settle Claims against the Debtor and Causes of Action against other Entities and implement settlements thereof. Subject to the payment of the Secured Lender Plan Contribution, and in exchange for that and other consideration provided by the Secured Lender hereunder, the Secured Lender and its Related Persons shall be entitled to receive the Debtor Release.

13.4 *Employee and Retiree Benefits*. The Debtor does not have any employee benefit plans. However, for the avoidance of doubt, if and to the extent any such plans exist, all employee benefit plans shall be terminated as of the Effective Date.

13.5 ***Injunction*. Except as otherwise provided in or to enforce the Plan or Confirmation Order, on and after the Effective Date, all Entities who have held, currently hold, or may hold Claims, Liens, or Causes of Action against or Interests in the Debtor, and/or that have held, currently hold or may hold claims that constitute Released Claims, are permanently enjoined from taking any of the following actions: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the Sale Assets, any Released Party or the assets of any Released Party, or any direct or indirect successor in interest of any of the foregoing, or any assets of any such transferee or successor, in each case on account of or in connection with or with respect to any such Claim, Lien, Interests, Cause of Action or Released Claim, other than as**

**contemplated by the Plan; (b) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree or order against the Sale Assets, any Released Party or the assets of any Released Party, or any direct or indirect successor in interest of any of the foregoing, or any assets of any such transferee or successor, in each case on account of or in connection with or with respect to any such Claim, Lien, Interests, Cause of Action or Released Claim; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Lien, Claim or encumbrance of any kind against the Sale Assets, any Released Party or the assets of any Released Party, or any direct or indirect successor in interest thereto, or any assets of any such transferee or successor, in each case on account of or in connection with or with respect to any such Claim, Lien, Interests, Cause of Action or Released Claim, other than as contemplated by the Plan; (d) asserting any set-off, right of subrogation or recoupment of any kind directly or indirectly against the Sale Assets, any Released Party or the assets of any Released Party, or any obligation due from any Released Party, or any direct or indirect transferee of any assets thereof, or successor in interest thereto, in each case on account of or in connection with or with respect to any such Claim, Lien, Interests, Cause of Action or Released Claim; and (e) commencing or continuing in any manner any action or other proceeding of any kind against the Sale Assets, any Released Party or the assets of any Released Party, in each case on account of or in connection with or with respect to any such Claim, Lien, Interests, Cause of Action or Released Claim; *provided, however*, that nothing contained herein shall be construed to prevent any Entity from objecting to Claims or defending against Claims objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law.**

13.6 ***Debtor Release*****. Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, to the fullest extent permitted by applicable law, and for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed released by each and all of the Releasing Parties, including the Debtor, the Estate, the Chapter 11 Trustee and his professionals, and the Plan Administrator and his professionals, from any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any or all of the Debtor, the Estate, the Chapter 11 Trustee and his professionals or the Plan Administrator and his professionals, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that any or all of the Debtor, the Estate, the Chapter 11 Trustee or the Plan Administrator could have been legally entitled to assert in its or their own right (whether individually or collectively), or on behalf of the holder of any Claim or Interest, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, (a) any or all of the Debtor or the Estate, (b) the Debtor's or the Secured Lender's restructuring or liquidation efforts, (c) the Chapter 11 Case, (d) the subject matter of, or the transactions or events giving rise to, any Claim or Interest, that is treated in the Plan, (e) the business or contractual arrangements between the Debtor and any Released Party, (f) the restructuring or any alleged restructuring or reorganization of Claims and Interests, prior to or in the Chapter 11 Case, (g) the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of the Plan (or the property to be distributed under the Plan), the Disclosure Statement, any contract, instrument, release or other agreement or document related to the Debtor, the Chapter 11 Case or the Estate**

**created, modified, amended, terminated or entered into in connection with the Plan, (h) the Sale(s) of the Sale Assets, including the process of marketing, selling and disposing of the Sale Assets pursuant to the Bidding Procedures Order, a Sale Order, the Confirmation Order, or other orders entered by the Bankruptcy Court in the Chapter 11 Case approving the Sale(s) or other disposition of Sale Assets; or (i) any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date relating to the Debtor, the Estate, the Chapter 11 Case or the Plan or the property to be distributed thereunder, including, for the avoidance of doubt, all Claims, Causes of Action or liabilities arising out of or relating to the Chapter 11 Case. Notwithstanding anything to the contrary in the foregoing, the Debtor Release shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence, willful misconduct or actual fraud. The Debtor Release provided for herein shall also not apply to any criminal conduct.**

13.7 **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtor, the Estate, the Chapter 11 Trustee, the Plan Administrator and all holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to the Debtor, the Estate, the Chapter 11 Trustee or the Plan Administrator and any holder of a Claim or**

**Interest or other Entity who would have been legally entitled to assert such Claim or Interest on behalf of the Debtor or the Estate from asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

13.8 *Exculpation*. Notwithstanding any other provision of the Plan, neither the Chapter 11 Trustee, the Chapter 11 Trustee's Professionals, the Plan Administrator, the Plan Administrator's professionals, the Secured Lender, the Secured Lender's Professionals, nor any of their officers, directors, members, employees or other agents, financial advisors, attorneys, accountants or professionals shall have any liability to any holder of any Claim or Interest for any act or omission in connection with or arising out of the negotiation, preparation and/or pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan, the Chapter 11 Case, the property to be distributed under the Plan, or any of the transactions contemplated under the Plan from the Filing Date through the Effective Date, except for liability resulting from conduct constituting actual fraud, gross negligence, willful misconduct or breach of fiduciary duty as determined by a Final Order of the Bankruptcy Court or other court of competent jurisdiction. Nothing herein shall limit the liability of any Entity or Person serving in such capacity on or after the Filing Date but before the Effective Date resulting from any act or omission that is determined by Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted actual fraud, willful misconduct, gross negligence or criminal conduct, or limit the liability of applicable attorneys to their respective clients for legal malpractice pursuant to N.Y. Comp. Codes R. & Regs. Tit. 22 § 1200, Rule 1.8(h)(1) (22 NYCRR § 1200.0) (2009).

13.9 *Injunction Notwithstanding Section 1141(d)(3).* On and after the Effective Date, all Entities that have held, currently hold, or may hold a Claim, Lien or Cause of Action or other claim against or interest in the Debtor that would be discharged or satisfied upon confirmation of the Plan and the occurrence of the Effective Date but for the provisions of section 1141(d)(3) of the Bankruptcy Code, are permanently enjoined from taking any of the following actions on account of such Claim, Lien, Cause of Action, or other claim or interest: (a) commencing or continuing in any manner any action or other proceeding on account of such Claim, Lien, Cause of Action or other claim or interest against the Debtor, the Plan Administrator and his professionals, the Sale Assets, the Debtor's property, or any other property that is to be distributed under the Plan or otherwise by the Plan Administrator or the Debtor's Estate; or (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against the Debtor, the Plan Administrator and his professionals, the Sale Assets, the Debtor's property or any other property to be distributed under the Plan or otherwise by the Plan Administrator or the Debtor's Estate; *provided, however*, that nothing in the Plan shall prevent a creditor that asserts a tort claim that is covered by insurance from pursuing such claim and recovering any judgment from the applicable insurance provider pursuant to applicable state law. For purposes of clarity, the Debtor shall not receive a discharge as is consistent with section 1141(d)(3) of the Bankruptcy Code.

**Retention of Jurisdiction**

14.1 The Bankruptcy Court shall retain exclusive jurisdiction of this Chapter 11 Case as long as necessary for the following purposes:

(a) To determine any and all objections to the allowance, disallowance or subordination of Claims or any controversy as to the classification of Claims;

(b) To determine any and all applications for Professionals' fees and for the reimbursement of disbursements and expenses;

(c) To liquidate any disputed, contingent or unliquidated Claims;

(d) To determine any and all pending motions and applications for assumption or rejection of executory contracts and unexpired leases and the allowance and classification of any Claims resulting from the rejection of executory contracts and unexpired leases;

(e) To determine any and all motions, applications, adversary proceedings, contested and litigated matters or such other matters over which the Bankruptcy Court has jurisdiction prior to the Confirmation Date, including the enforcement, prosecution, litigation, settlement and/or other disposition of claims of the Debtor;

(f) To enforce the provisions of, and resolve any and all disputes under or pertaining to the Plan or the Debtor's Chapter 11 Case;

(g) To modify the Plan or to correct any defect, cure any omission or reconcile any inconsistency in the Plan or in the Confirmation Order, or to enter such orders as may be necessary to effectuate the terms and conditions of the Plan to the extent authorized by the Bankruptcy Code as may be necessary to carry out the purpose and intent of the Plan, provided that the Secured Lender must consent in writing to any modification of the Plan;

(h) To determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code;

(i) To hear and determine all controversies, suits and disputes, if any, as may arise with regard to orders of the Bankruptcy Court in the Chapter 11 Case;

(j) To hear and determine any and all controversies and disputes arising under, or in connection with, the Plan or the Confirmation Order;

(k) To adjudicate all controversies concerning the classification of any Claim;

(l) To liquidate damages in connection with any disputed, contingent or unliquidated Claims;

(m) To adjudicate all Claims to a security or ownership interest in any property of the Debtor or in any proceeds thereof;

(n) To adjudicate all Claims or controversies arising out of any purchases, sales or contracts made or undertaken during the pendency of this Chapter 11 Case;

(o) To recover all assets and properties of the Debtor wherever located, including the prosecution and adjudication of all Causes of Action available to the Debtor as of the Confirmation Date;

(p) To determine all questions and disputes regarding recovery of and entitlement to the Debtor's assets and determine all claims and disputes

between the Debtor and any other Entity, whether or not subject to an action pending as of the Confirmation Date;

(q) To enter any order, including injunctions, necessary to enforce the title, rights and powers of the Debtor and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Bankruptcy Court may deem necessary or appropriate;

(r) To enter an order or final decree closing and terminating the Chapter 11 Case; and

(s) To make such orders as are necessary or appropriate to carry out the provisions of the Plan, including but not limited to orders interpreting, clarifying or enforcing the provisions thereof and/or confirming the Plan.

**ARTICLE XV**
**Plan Support Agreement**

15.1 *Plan Support Agreement*. The Plan Support Agreement attached hereto as Exhibit B sets forth the terms under which the Chapter 11 Trustee, the Secured Lender, and each Supporting Party have agreed to support confirmation of the Plan. The parties to the Plan Support Agreement are: (a) the Chapter 11 Trustee; (b) the Secured Lender; and (c) each Supporting Party that has executed the Plan Support Agreement.

15.2 *Terms of Plan Support Agreement*. Pursuant to the Plan Support Agreement:

(a) The Secured Lender shall pay the Administrative Claim Supporting Party Secured Lender Plan Contribution in the aggregate amount of Two Hundred Fifty Thousand Dollars ($250,000.00) to the Disbursing Agent on the Effective Date or as soon as reasonably practicable thereafter;

(b) The Disbursing Agent shall distribute the Administrative Claim Supporting Party Secured Lender Plan Contribution to each Supporting Party on a Pro Rata basis based upon the amount of each Supporting Party's Allowed Supporting Party Administrative Claim relative to the aggregate amount of all Allowed Supporting Party Administrative Claims held by all Supporting Parties;

(c) Each Supporting Party shall accept its Pro Rata Share of the Administrative Claim Supporting Party Secured Lender Plan Contribution in full settlement, satisfaction, release and discharge of such Supporting Party's Allowed Supporting Party Administrative Claim (other than such Supporting Party's right to receive its Pro Rata Share of any Net Avoidance Action Recoveries pursuant to section 15.2(d));

(d) Each Supporting Party shall be entitled to receive its Pro Rata Share of any Net Avoidance Action Recoveries recovered by the Plan Administrator, which amounts shall be distributed as and when such proceeds are received pursuant to further order of the Bankruptcy Court; and

(e) Upon receipt of its Pro Rata Share of the Administrative Claim Supporting Party Secured Lender Plan Contribution, each Supporting Party shall be deemed to have released, waived and discharged all Claims and Causes of Action against the Debtor, the Debtor's Estate, the Chapter 11 Trustee, the Secured Lender, the Plan Administrator and their respective officers, directors, members, managers, employees, agents, representatives, attorneys, accountants, successors and assigns arising from or related to such Supporting Party's Supporting Party Administrative Claim*; provided, however*, that such release shall not impair such Supporting Party's right to receive its Pro Rata Share of any Net Avoidance Action Recoveries pursuant to section 15.2(d).

15.3 *Support Obligations*. Each Supporting Party has agreed under the Plan Support Agreement: (a) to support confirmation of the Plan; (b) to the treatment of its Allowed Supporting Party Administrative Claim as set forth in the Plan Support Agreement, in accordance with the terms of the Plan Support Agreement and section 1129(a)(9)(A) of the Bankruptcy Code; (c) not to object to, delay, or take any action intended to prevent or frustrate confirmation of the Plan or the

transactions described in the Plan Support Agreement; (d) not to support, solicit, or encourage any alternative plan of reorganization or liquidation other than the Plan; and (e) not to take any other action that is materially inconsistent with the Plan Support Agreement or the Plan.

15.4 *Confirmation Order Findings*. Entry of the Confirmation Order shall constitute the Bankruptcy Court's finding that the Plan Support Agreement is enforceable and binding upon all parties thereto and their successors and assigns. The Confirmation Order shall provide that the terms of the Plan Support Agreement are incorporated into and made a part of the Plan.

Dated: October 21, 2026
Uniondale, New York

EMG TRANSFER AGENT LLC

By: *<u>/s/Katherine Meagher</u>*
Name: Katherine Meagher
Title: Authorized Signatory